**Charles Russell TWIST, Appellant,**

**v.**

**Edwin MEESE, Attorney General, U.S. Department of Justice, Appellee.**

**No. 87–5371.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 16, 1988.

Decided Aug. 23, 1988.

Joseph B. Scott, with whom Irving Kator and David H. Shapiro, Washington, D.C., were on the brief, for appellant.

Jeffrey S. Paulsen, with whom John R. Bolton, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Brook Hedge, Mary E. Goetten and Robin Ball, Washington, D.C., were on the brief, for appellee. Michael Jay Singer, Washington, D.C., also filed an appearance on behalf of the appellee.

Before MARKEY,[*] Chief Judge, and FRIEDMAN,[*] Circuit Judges for the Federal Circuit and GARTH,[**] U.S. Senior Circuit Judge for the Third Circuit.

Opinion for the court filed by Senior Circuit Judge GARTH.

GARTH, Senior Circuit Judge:

Plaintiff/appellant Charles Russell Twist commenced this action against defendant/appellee Edwin Meese, Attorney General of the United States, alleging that his discharge by the Department of Justice was in violation of his first and fifth amendment rights. The district court dismissed Twist's fifth amendment claim on April 2, 1987, 661 F.Supp. 231, 233–34 (D.D.C.1987), and on October 19, 1987 granted summary judgment to the Attorney General ("government") on Twist's first amendment claim. We affirm.

I.

Twist was hired as an attorney for the Justice Department's antitrust division in 1979. In June 1984, he was reassigned from Washington, D.C., to the Field Office in Cleveland, Ohio. Upon arriving in Cleveland, Twist was assigned to an antitrust investigation involving the *Cleveland Press* newspaper. Twist was a staff attorney on this investigation.

Soon after his assignment to the *Cleveland Press* case, Twist expressed his disagreement with the manner in which the Justice Department was conducting the investigation. Eventually, Twist accused several members of the Justice Department with obstructing justice.

Twist, together with another attorney assigned to the investigation, wrote several memoranda to his superiors suggesting that certain grants of immunity would be improper. Twist also spoke to the District Court Judge who would review any immunity requests made by the government in the *Cleveland Press* investigation. Additionally, Twist initiated two meetings with the law clerk of the district court judge and shared with the law clerk his view that certain immunity requests, then under consideration by the government, were improper. When questioned by his superiors about these incidents, Twist initially denied they had occurred, but later admitted to them.

As a result of these incidents, in June 1985, Twist was removed from the *Cleveland Press* investigation and reassigned to other duties. He also received an "unsatisfactory" job performance evaluation and was refused a promotion. Twist appealed both of these decisions alleging that they were in retaliation for his claims that the Department was obstructing justice. Twist's claims of retaliation were referred to the Justice Department's Office of Professional Responsibility ("OPR"). After an investigation, the OPR concluded that the actions taken by the government in the *Cleveland Press* investigation were appro-

---

[*] Sitting by designation pursuant to 28 U.S.C. § 291(a).

[**] Sitting by designation pursuant to 28 U.S.C. § 294(d).

priate exercises of prosecutorial discretion, and did not constitute an obstruction of justice. (A300).

Because his performance had been rated deficient, Twist was informed by the Chief of the Cleveland office, John Weedon, that he would be given 90 days to improve his performance or would face discharge. Twist was also ordered to meet with Weedon every Friday for the purpose of discussing his work. At these weekly meetings, Twist was required to produce whatever written material he had produced that week.

At first, Twist complied with these requirements. However, on June 20, 1986, when David Hils, as Acting Chief of the office in the absence of Weedon, attempted to conduct one of the weekly meetings, Twist refused to cooperate. Hils subsequently recommended to the Assistant Attorney General in charge of the antitrust division, Douglas H. Ginsburg (now a United States Circuit Judge of the United States Court of Appeals for the District of Columbia), that Twist be discharged.

Hils documented Twist's conduct in two letters to Ginsburg. In his first letter, dated June 25, 1986, Hils described Twist's refusal to accept an assignment to a pending antitrust investigation involving concrete pipe. Hils wrote that Twist "emphatically said, 'I won't do it.'" (A201). The letter also described a discussion between Weedon, Hils and Twist, concerning Twist's assignment to the concrete pipe investigation. The letter stated that during this discussion, Twist strongly criticized Weedon's refusal to assign him to a different investigation. In that same letter, Hils recited that Twist had accused him, Hils, of lying concerning an unrelated matter. Hils also wrote that Twist, upon the commencement of the meeting, stated that he considered the meeting to be part of a cover-up of a crime, and that Twist had accused Hils of being a co-conspirator and of harassing him. On July 8, 1986, Hils again wrote to Ginsburg and once again requested Twist's discharge.

Upon receiving these letters, Ginsburg called Twist and Hils to Washington for an on-the-record hearing at which Twist could respond to Hils' charges against him and submit a written statement. After reviewing Twist's statement, Ginsburg recommended to the Deputy Attorney General that Twist be discharged. Twist was terminated on August 15, 1986, for "insubordinate and disrespectful conduct toward his supervisor." (A318).

Twist thereupon filed a non-jury action against the Attorney General in the United States District Court for the District of Columbia, alleging violations of his fifth and first amendment rights. On April 2, 1987, the district court dismissed Twist's fifth amendment claim. On September 1, 1987, the Attorney General moved for summary judgment on Twist's first amendment claim. Twist filed his opposition papers including affidavits and other exhibits, on September 14, 1987. However, contrary to the provisions of district court Local Rule 108(h), Twist did not file a required statement of material facts in dispute. Only later, on October 5, 1987, after the Attorney General's reply papers had been served, did Twist file a statement of disputed facts.

The Attorney General's summary judgment motion was heard by the district court on October 8, 1987, and granted by an order entered on October 19, 1987. The district court also denied a pending discovery request by Twist to compel the production of documents in the possession of the OPR.

## II.

Twist first argues that the district court abused its discretion in accepting as true, the government's statement of material facts not in dispute because he, Twist, had violated district court Local Rule 108(h) when he failed to submit his counterstatement. The district court, in refusing to accept Twist's statement, relied upon Rule 108(h) which provides, among other things, that:

> An opposition to [a summary judgment motion] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to

which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement .... In determining a motion for summary judgment, the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

The party opposing summary judgment is required, under Rule 108(b), to serve and file its opposition to the motion, *including its separate statement of issues setting forth the disputed material facts* within 11 days of the date of service of the summary judgment motion. Rule 108(h), which succeeded Rule 1–9(h) is substantively identical to the former Rule. The purpose for promulgating former Rule 1–9(h) was explained in *Gardels v. Central Intelligence Agency*, 637 F.2d 770 (D.C.Cir.1980), where it was said:

> Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes. The moving party's statement specifies the material facts and directs the district judge and the opponent of summary judgment to the parts of the record which the movant believes support his statement. *The opponent then has the opportunity to respond by filing a counterstatement and affidavits showing genuine factual issues. The procedure contemplated by the rule thus isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record.* These purposes clearly are not served when one party ... fails in his statement to specify the material facts upon which he relies and merely incorporates entire affidavits and other materials without reference to the particular facts recited therein which support his view that no genuine issues of material fact exist.

*Id.* at 773 (emphasis added). *See also McKinney v. Dole*, 765 F.2d 1129, 1135 n. 12 (D.C.Cir.1985).

The importance of complying with the procedures originally established by former Local Rule 1–9(h), and now continued in Local Rule 108(h), has been emphasized by the courts of this Circuit. The failure to file a proper Rule 1–9(h) statement (now a 108(h) statement) in opposing a motion for summary judgment, may be fatal to the position of the non-complying party. *See Gardels*, 637 F.2d at 773 (citing cases); *Tarpley v. Greene*, 684 F.2d 1, 6 & n. 15 (D.C.Cir.1980).

In the present case, the government's motion for summary judgment was served and filed on September 1, 1987. Local Rule 108(b) required the opposing papers to be filed within 11 days of the date of that service, or within such time as the district court may have directed. Twist, in fact, filed his opposition on Monday, September 14, 1987, precisely within the prescribed time period (the eleventh day fell on the weekend). However, Twist at that time failed to file the critical Rule 108(h) "separate concise statement of genuine issues setting forth all material facts as to which [he] contended there exists a genuine issue necessary to be litigated," together with record references. This statement, pursuant to the Rule, was required to accompany Twist's opposition to the government's motion.

On October 5, 1987, the Friday before the scheduled Monday argument, Twist responded to the government's statement. The district court, having been earlier presented with the government's statement consisting of 31 uncontested facts with record references, and with Twist's opposition which had failed to include Twist's counterstatement of genuine issues of fact, relied on Rule 108(h) to hold that the material facts identified by the government were deemed admitted.

We cannot charge the district court with having abused its discretion by doing so. First, Local Rule 108(h) explicitly requires the submission of a statement of disputed facts and warns the parties of the possibility of the very sanction ultimately imposed against Twist. Second, the Rule specifically provides the time limits within which

such a statement must be served and filed —time limits concededly violated by Twist. Third, while Twist eventually filed the required statement, it was filed at a time not only beyond that required by the letter of the Rule, but more importantly, at a time which precluded the district court from an effective use of that statement in its preparation to hear and decide the motion.

As *Gardels, supra,* intimates in its examination of the Rule's purpose, a district court judge should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make his own analysis and determination of what may, or may not, be a genuine issue of material disputed fact. In this respect, a district court may legitimately look to and rely upon counsel to identify the pertinent parts of the record, to isolate the facts that are deemed to be material, and to distinguish those facts which are disputed from those that are undisputed.

When counsel fails to discharge this vital function, he may not be heard to complain that the district court has abused its discretion by failing to compensate for counsel's inadequate effort. In the present case, where the record includes volume upon volume of depositions taken of nine individuals, multiple affidavits, and numerous interrogatories and other discovery requests (some of which were answered and others which were not), we cannot ask, nor can we expect, the district court to undertake an independent analysis unaided by counsel. Indeed, the express terms of Rule 108(h) disclose that this is the precise circumstance which the Rule's requirements were designed to overcome.

Moreover, Twist at no time has ever sought to explain his lack of compliance with Local Rule 108(h), nor did he ever file a motion in an effort to have the district court accept his tardy submission. We express no opinion as to whether furnishing such an explanation, or making such a motion, should excuse delinquent counsel. We leave such decisions wholly to the discretion of the district court where they should properly rest. However, Twist's failure to explain, or to move, indeed his failure to date to proffer any explanation, even to this court, for his lack of compliance, are relevant matters for our consideration in determining whether the district court properly exercised its discretion. We are satisfied that in the absence of the statement required to be furnished by Twist, the district court did not abuse its discretion in accepting as "admitted" the facts identified by the government in the government's statement of material facts.[1]

### III.

As we understand Twist's claim, it is that he was not discharged for insubordination, but rather that he was fired in retaliation for his protected speech.[2] However, the treatment of this issue in Twist's brief focuses not on "protected speech" but rather on events which Twist claims constituted an obstruction of justice by the Justice Department, an issue not before us. In light of Twist's first amendment claim, it appears to us that the appropriate focus must be on those instances of "speech" which Twist claims were protected and which allegedly gave rise to his termination. In this respect, the critical "protected speech" which may be discerned from this record centers on Twist's two discussions with the law clerk of a district court judge and a brief meeting with the district court judge during the period in 1985 that Twist was assigned to the *Cleveland Press* investigation.

1. We have no doubt that the result in this case would have been the same even if the district court had considered Twist's tardy Rule 108(h) statement. The "facts" which Twist asserts are material, are not, in our opinion, material to the issues on appeal, and those "facts" which Twist contends are disputed, do no more than contradict insignificant and immaterial facts asserted by the government.

2. Just as the district court did not find it necessary to resolve the issue of whether Twist's speech was protected under the circumstances of this case, (A19), we too find it unnecessary, in light of our disposition of Twist's appeal, to address that issue. We observe, however, that the government has argued as an alternative ground, that Twist's speech was not protected.

The "evidence" suggested by Twist as supporting his contention that he was fired in retaliation for his protected speech, is as follows:

1.  It was suggested by one of Twist's superiors that Twist begin looking for a new job. This suggestion was made at a meeting during which the subject of Twist's *ex parte* meeting with a district court judge and the judge's law clerk concerning Twist's obstruction of justice claim, was discussed.

2.  That in August of 1985 he was given a poor evaluation which included criticism of his contact with the law clerk. (A123–24).

3.  That he was refused a promotion for the same reason. (A128).

4.  That the notice giving him 90 days to improve his performance included criticism of his contact with the law clerk. (A132–39).[3]

However, in order for Twist to prevail in his retaliatory claim, he must demonstrate that the speech at issue was a substantial or motivating factor in the government's decision to fire him. *Mount Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). The district court addressed this subject in its opinion which granted summary judgment to the government. The district court stated:

> The controlling material facts are not disputed. The basic background and course of events leading to Twist's termination are presented in the Department's 31 precise statements of uncontested facts, each well referenced to documents, transcripts, etc. Twist's opposition, filed by his attorney, contains no counterstatement of genuine issues of fact. Thus, pursuant to the last sentence of Rule 108(h) of the Rules of this Court, the Department's statement of material undisputed facts is accepted. D.D.C. Rule

108(h) (effective June 30, 1987). The crucial issue that remains is therefore not whether plaintiff was insubordinate and discourteous and frequently showed poor judgment. These facts are well established and uncontroverted. Twist contends, however, that his discharge, in fact, resulted from exercise of his first amendment rights.

\*    \*    \*    \*    \*    \*

Twist's termination occurred considerably after [his communications with the law clerk]. His discharge for insubordination was requested by two of his superiors based on events occurring in their presence. Examples of his misconduct were recited in letters dated June 23, 1986 and July 8, 1986. Douglas H. Ginsburg, then Assistant Attorney General for Antitrust, conducted an on-the-record hearing where he provided Twist full opportunity to respond to these letters.

Mr. Ginsburg has testified, by deposition, that following this hearing, he decided to recommend discharge based solely on the aforementioned letters reinforced by examples of Twist's poor judgment such as those outlined in the Department's statement of undisputed facts which stands uncontroverted. He denies, under oath, that Twist's communications to the judge, directly or through the law clerk, played any part in his final decision. The Deputy Attorney General approved Mr. Ginsburg's recommendation for discharge after receiving further written representations from Twist.

\*    \*    \*    \*    \*    \*

Twist continues to urge, however, that his discharge occurred because he spoke to the judge and law clerk claiming Department's officials were obstructing justice. . . .

---

**3.** Twist also claims that he did not admit, during his hearing before Assistant Attorney General Ginsburg, that he had in fact made threatening statements to his supervisors. (A361). We observe that it is immaterial whether Twist admitted making the statements attributed to him. Hils charged that Twist made these statements and Twist has never denied or contradicted this fact. Moreover, the fact of Twist's threats pertains not to the issue of retaliatory firing for protected speech, but rather to the issue of insubordination and the Department of Justice's perception of his insubordinate conduct.

Twist's claim that he was discharged because of his statements to the judge and the law clerk rests almost entirely on his unsupported surmise. He offers nothing more than a colorable inference, snatching at a few unconnected bits of proof in an attempt to overcome the solid documentary and sworn testimony to the contrary.

(A16–19).

We agree with the district court's reading and analysis of the record. In contrast to the government's overwhelming proof that Twist was terminated because of his insubordinate and disrespectful conduct, Twist has furnished no evidence that his discharge was prompted by his conversations with the judge and the judge's law clerk. It was apparently those meetings with the judge and his law clerk, among other things, which led to Twist's unsatisfactory performance rating and to doubts about Twist's judgment.[4] However, the record discloses that Twist was not discharged in June 1985 when he was removed from the *Cleveland Press* investigation. Rather, Twist was terminated in August 1986, some 14 months later and then only after the two disruptive meetings held in June and July 1986 with Hils, the Acting Chief of the Cleveland Office.

Those meetings gave rise to the two letters sent by Hils to Assistant Attorney General Ginsburg. The letters detailed, with great particularity, Twist's insubordinate actions, none of which Twist has denied or contradicted.[5] The letters reveal that Twist refused an assignment concerning a concrete pipe investigation; that Twist, without basis, accused Hils and two other Department attorneys of lying about an unrelated matter; and that Twist sought to intimidate Weedon and undercut Weedon's authority in making assignments. The letters also charged Twist with claiming that the scheduled Friday

meetings were part of a criminal cover up, and asserting that if Hils participated in and conducted the June 20, 1986 meeting he, Hils, would be guilty of misprision of a felony. In addition, Hils' letters brought out that Twist had failed to comply with Weedon's directions to produce certain draft memoranda and that Twist was otherwise disrespectful and insubordinate.

A fair reading of the letters written by Hils, who was Twist's superior, convey the unmistakable fact (a fact never denied by Twist) that Twist's conduct towards his superiors was insubordinate and disrespectful. Indeed, the declaration filed by then Assistant Attorney General Ginsburg, states unequivocally that his decision to recommend Twist's discharge was based solely upon the incidents set forth in the June 25, and July 8, 1986 letters. Those letters led him to conclude that "Mr. Twist's insubordinate and disrespectful conduct towards his supervisors was unexcused and likely to recur." (A326). Ginsburg's recommendation reflected his conclusion

> that Mr. Twist's conduct had been designed to impede, through threats and intimidation, Mr. Hils' performance of his supervisory duties. I regard this conduct alone as sufficient to warrant Mr. Twist's removal because of its highly detrimental effect on the efficient operation of the office. I also thought it likely that Mr. Twist would persist in this conduct unless removed from his position.

(A326–27).

It was after the hearing conducted by Ginsburg on July 9, 1986, that Ginsburg's August 4, 1986 "Action Memorandum," (A292), was forwarded to the Deputy Attorney General who ultimately discharged Twist. That memorandum, to which were attached the letters from Hils, the transcript of the July 9, 1986 hearing, and

---

**4.** *See* Defendant's Statement of Material Facts as to Which Defendant Contends There is no Material Dispute, filed September 1, 1987, ¶¶ 19 & 22.

**5.** In Twist's tardy statement of material facts in dispute, (a document which we have held was properly not accepted by the district court),

Twist asserts that "[p]laintiff did not tell Mr. Hils at the July 3, 1986 meeting that he would file a suit against him if he continued the meeting." (A361). This is the only evidence, if accepted, which refutes any aspect of the government's claim that Twist was fired for insubordination.

Twist's reply of July 22, 1986, summarized Twist's insubordinate actions. The memorandum then set forth Ginsburg's conclusions leading to his recommendation of discharge because of Twist's "repeated outrageous behavior." *Id.* Nowhere in that recommendation is there mention, or even an intimation, of Twist's conversation with the judge and the judge's law clerk.

Thus, as the district court observed and as we have concluded, Twist has failed to present any probative evidence from which it could be even inferred that Twist's conversations with a district court judge, and the judge's law clerk, bore in any way on Twist's dismissal—a burden which Twist must meet to avoid summary judgment. *See Catrett v. Johns–Manville Sales Corp.,* 826 F.2d 33, 39 (D.C.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1028, 98 L.Ed.2d 992 (1988).

Fed.R.Civ.P. 56(c) directs that summary judgment is to be granted if the record shows:

> that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

We have been instructed that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The Supreme Court, in *Anderson,* equated the summary judgment standard with the standard employed for a directed verdict. Thus, because our review is plenary, the question before us, as it was before the district court, becomes:

> whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

*Id.* at 251–52, 106 S.Ct. at 2511–12. *See also Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After independently reviewing the evidence in the instant record, we agree with the district court that "[g]iven the mass of undisputed proof no reasonable trier of fact could find for Twist." (A19).

## IV.

■ Twist also contends that his termination violated his fifth amendment rights because he held a property interest in his employment. In support of this claim, Twist cites to *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) and relies upon 5 U.S.C. § 2302(b)(10) as the statute which creates his property interest. This argument requires only brief discussion inasmuch as the issue raised by Twist is exactly the same issue which we have decided today in *Garrow v. Gramm,* 856 F.2d 203 (D.C.Cir.1988).

■ Like the discharged employee in *Garrow,* Twist is a nonveteran, "Excepted Service" employee. In *Garrow,* we have held that such an employee does not possess a due process right to his job and that 5 U.S.C. § 2302(b)(10) does not provide a property interest in continued employment. Thus, *Garrow*'s holding controls, and is fatal to, the claim made here by Twist. Moreover, given the fact that Twist received advance notice, an on-the-record hearing, and an opportunity to submit a written answer to the charges against him, even if Twist had a property right to his continued employment, which we have held he does not, he has received all the process to which he would be due.

## V.

■ On the date that the district court granted summary judgment to the government it also denied Twist's motion for discovery of a report produced by the Justice Department's Office of Professional Responsibility regarding Twist's allegations of an obstruction of justice. Twist also sought the underlying documentation on which the report was based.

The district court denied Twist's discovery motion holding: "Defense counsel does not have access to these records, which are protected by grand jury privilege. There is no indication that any mat-

ters before the Board were considered in the decision to discharge. The Board eventually reported unfavorably on all of plaintiff's charges. No purpose could be served by disclosure and no need has been shown." (A11).

Twist, on whom the burden fell to demonstrate the relevance of the OPR report to his first amendment claim, has failed to develop a record which would require the production of that report. Nothing appears of record that even indicates, let alone establishes, that the report was considered by those responsible for Twist's discharge or that the report even referred to Twist's claim of "protected speech" retaliation. Indeed, Twist had ample opportunity, while conducting his discovery inquiries, to develop just such a record. In the absence of a showing of relevance, the district court did not abuse its discretion in denying Twist's motion. *See United States v. West,* 672 F.2d 796 (10th Cir.), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2959, 73 L.Ed.2d 1350 (1982).

Moreover, we have carefully examined the notes of transcript pertaining to the district court's hearing of Twist's motion, and it is clearly evident that the district court considered and weighed numerous factors including relevancy, privilege, and grand jury secrecy, before exercising its discretion and concluding that the report should not be disclosed.[6] Indeed, even apart from considerations of privilege and grand jury secrecy, absent a showing of relevancy, we are satisfied that the district court did not abuse its broad discretion in denying Twist's motion.

### VI.

We will affirm the district court's October 19, 1986 order denying Twist's discovery motion. We will also affirm the orders of the district court dismissing Twist's fifth amendment claim and granting summary judgment to the government on Twist's first amendment claim.

---

**6.** Among other factors, the district court noted that it was the trier of fact. The district court stated:

> And I've got a non-jury matter in front of me so I can't do what I normally do, which would be to ask for the [OPR] report, take a look at

the report, draw some conclusions from looking at the report as to whether or not there was anything in there that might be useful, you see. But I can't—I don't think I should do that when I'm the finder of facts. (A78).