Arthur L. TRAWICK, Plaintiff,

v.

Alan HANTMAN, Architect of the Capitol, in his official capacity, Defendant.

No. 99CV1005 (ESH).

United States District Court, District of Columbia.

July 3, 2001.

Jeffrey Howard Leib, Washington, DC, for plaintiff.

Mark E. Nagle, Edward Alkalay, U.S. Attorney's Office, Washington, DC, Wilma Antoinette, Crowell & Moring, L.L.P., Washington, DC, for defendant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiff Arthur Trawick has brought this suit against the Architect of the Capitol ("AOC"), in his official capacity, pursuant to the Congressional Accountability Act, 2 U.S.C. § 1311(a)(3), alleging that he was disciplined, suspended, and ultimately terminated because of his disabilities and in retaliation for protected activity. Defendant responds that plaintiff has failed to establish a prima facie case of disability discrimination and retaliation and that defendant disciplined and terminated plaintiff for repeated absences without leave, attendance problems, and incidents of sleeping on the job. Because plaintiff has failed to establish a prima facie case of discrimination and retaliation and failed to offer any evidence that defendant's stated reasons for disciplining and terminating plaintiff are pretextual, the Court will grant summary judgment in favor of defendant on all counts.

## BACKGROUND

Plaintiff was employed by the AOC beginning in April/May 1995, as a fireman/Boiler Plant Worker ("BPW") in the Capitol Power Plant ("CPP"). Def. St. of Facts ¶ 2. The CPP operates central steam and refrigeration plants to provide heating and air conditioning to approximately 15 million square feet of building space on and around the 275 acres of the Capitol complex, including the U.S. Capitol, three Senate Office Buildings, four House Office Buildings, the Supreme Court, three Library of Congress Buildings, the House and Senate garages, the Capitol Police

Headquarters, and the Union Station complex. *Id.* ¶ 1. Plaintiff's responsibilities included: (1) performing adjustments to oil and coal burning components of boilers, and performing preventative maintenance to that equipment; (2) inspecting burning conditions in the firebox, and adjusting grate speed, coal spreader, or oil valve opening to suit conditions; (3) performing or assisting with repairs to mechanical equipment and boiler components; (4) assisting the engineers with tasks as assigned; (5) inspecting the boilers; (6) operating on an assigned watch; and (7) cleaning the "burning gun" in the boilers. *Id.* ¶ 2. Plaintiff's duties contributed to maintaining the safety conditions in the CPP and to producing the steam necessary for heating and air conditioning in the surrounding buildings. *Id.* ¶ 3. During his tenure at the AOC, plaintiff worked three different shifts—day shift (6 a.m.—2 p.m.), swing shift (2 p.m.—10 p.m.), and night shift (10 p.m.—6 a.m.)—and only one fireman is on duty during each of these shifts. *Id.* ¶ 5.

Plaintiff alleges that during his employment, he suffered from medical skin disabilities, including chloracne and eventually lymphoma skin cancer, which resulted from his exposure to Agent Orange during his military service in Vietnam, and that management was aware that the medication he was taking to treat these skin disorders had the recurring and residual side effect of causing drowsiness. Am. Compl. ¶¶ 18–21. Plaintiff also alleges that he informed management in 1995 that he suffered from Post Traumatic Stress Disorder ("PTSD") as a result of his military service in Vietnam, and that in April 1998 he was diagnosed with "a disability of substance abuse." Am. Compl. ¶¶ 22–25.

Within his first year at AOC, defendant had concerns about plaintiff's poor attendance and failure to follow proper leave procedures. Def. St. of Facts ¶ 6. On June 24, 1996, defendant issued plaintiff a warning letter to communicate defendant's concern about his poor attendance, failure to follow proper leave procedures, and excessive use of leave. *Id.* The letter also informed plaintiff that future unauthorized absences would be charged as absence without leave ("AWOL") and may result in further disciplinary action, including official reprimand, suspension without pay, and termination. *Id.* The letter further advised plaintiff that if he were "experiencing problems of a personal nature, including alcoholism or drug abuse," the Employee Assistance Program ("EAP") provided "counseling and information on an entirely confidential basis." *Id.*

On November 21, 1996, plaintiff received a proposed Official Reprimand for continued AWOL, which was confirmed on December 23, 1996. *Id.* ¶ 7. The Official Reprimand listed eight separate dates on which plaintiff was AWOL—March 12, 1996, May 21, 1996, September 24, 1996, October 8, 1996, October 21, 1996, October 22, 1996, November 15, 1996, and November 16, 1996. *Id.* Plaintiff admits that he was AWOL on each of these dates. *Id.* Plaintiff was also notified that "in the event there are additional instances of AWOL from the date of the proposed Official Reprimand, you may be suspended from your position without pay." *Id.*

After the Official Reprimand, plaintiff incurred additional incidents of AWOL in 1997. *Id.* ¶ 8. On October 2, 1997, defendant proposed to suspend plaintiff from his position for 10 days, listing eighteen separate instances of AWOL between May 23, 1997 and June 20, 1997. *Id.* By letter dated December 5, 1997, plaintiff's supervisor Leonard Gibson concurred with the proposal to suspend plaintiff for continued AWOL and failure to follow proper procedure for requesting leave, but reduced the

proposed suspension to three days. *Id.* ¶ 9. Plaintiff accepted the suspension and was suspended without pay for three days in January 1998. Def. Exs. I & J. After the suspension, plaintiff again incurred numerous AWOLs in February and March 1998. Def. St. of Facts ¶ 10. In April 1998, defendant suggested, and plaintiff received permission, to use leave for an in-patient substance abuse treatment program. *Id.* Plaintiff alleges that he successfully completed the treatment program and was released on May 12, 1998. Am. Compl. ¶ 26. Plaintiff was AWOL on nine separate occasions after the January suspension, including several times after he had returned from in-patient substance abuse treatment. Def. St. of Facts ¶ 10. In addition, on July 29, 1998, plaintiff was observed sleeping at a table in the boiler room while he was on duty. *Id.* Plaintiff's supervisor Edward Baranowski woke him up and plaintiff became belligerent, hitting a table with his fist and pushing his chair away. *Id.*[1] Plaintiff admits that he was sleeping on duty and that he had done so on other occasions. *Id.*

On August 18, 1998, Gibson wrote to the Employee Relations Specialist, Barbara Willoughby, stating that "EAP sessions ... are not accomplishing their intended objective." *Id.* ¶ 11. Therefore, he requested that defendant issue "a proposed termination for failure to properly schedule leave in advance and for failure to report for duty at his assigned time." *Id.* On September 1, 1998, plaintiff contacted the Office of Equal Opportunity and Conciliation Programs complaining of Baranowski's handling of the July 29, 1998 incident and alleging that Baranowski's mannerisms and tone of voice created a hostile environment. Pl. Exs. B & C. On October 13, 1999, the proposed termi-

nation was issued. Def. Ex. K. After a hearing on February 19, 1999, plaintiff was notified on March 4, 1999 that he was terminated effective March 5, 1999. Def. St. of Facts ¶ 12; Def. Ex. L.

## I. STANDARD OF REVIEW

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "While summary judgment must be approached with special caution in discrimination cases, ... a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence." *Calhoun v. Johnson,* 1998 WL 164780 at *3 (D.D.C. March 31, 1998), *aff'd,* 1999 WL 825425 (D.C.Cir. Sept.27, 1999) (citation omitted). In addition, LCvR 7.1(h) provides that an opposition to a motion for

---

1. Plaintiff was observed sleeping two other times on that date, and each time he was awakened, he became belligerent. Def. Ex. M ¶ 5; Ex. N ¶¶ 4–6.

summary judgment "shall be accompanied by a separate concise statement of genuine issues setting forth all materials facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include reference to the part of the record relied on to support the statement."

Plaintiff does not set forth any facts in his statement to contest that he was absent without leave on numerous occasions, that he had attendance problems, that he slept on the job, or that he received a series of warnings and reprimands for this conduct.[2] Plaintiff's statement instead contends that (1) defendant did not inform plaintiff of the "policies, practices, regulations and procedures" that governed his use of leave; (2) defendant did not determine that plaintiff was not a qualified individual with a disability or that he was not performing the essential functions of the job; and (3) plaintiff never received an unsatisfactory performance evaluation and was never charged with a violation of a safety code or safety-procedures, and (4) all disciplinary actions, including his termination, were ultra vires acts by defendant in the absence of a legislatively mandated personnel policy. *See* Pl. St. of Facts ¶¶ 7–12. The only material factual assertion in plaintiff's statement is that the proposal of his termination was issued only after he initiated EEOC activity. *Id.* ¶ 12.[3]

In his papers, plaintiff repeatedly cites without page or paragraph reference his Complaint and his Amended Complaint,[4] which are not verified, *see id.* ¶¶ 7–

9, and provides no citation to a specific paragraph of his 50 paragraph unsigned "affidavit," which is attached to the opposition after Exhibit 7. Plaintiff's statement of material facts cites no other documents in the record. Plaintiff's general references to the pleadings and his unsigned affidavit to support his assertions, contravene both Fed.R.Civ.P. 56(e) and LCvR 7.1(h) and ignore this Circuit's opinion in *Twist v. Meese,* 854 F.2d 1421 (D.C.Cir.1988), wherein the Court cautioned that the burden is on the parties, not on the court, to "identify the pertinent parts of the record, to isolate the facts that are deemed to be material, and to distinguish those facts which are disputed from those that are undisputed." *Id.* at 1425. Given plaintiff's failure to refute any of the specific factual assertions that defendant has proffered, *see Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner,* 101 F.3d 145, 151 (D.C.Cir.1996), defendant's Statement of Facts will be treated as conceded, as permitted by LCvR 7.1(h) ("[T]he court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").

## II. ANALYSIS

Plaintiff is suing under the Congressional Accountability Act ("the Act"), which provides, *inter alia,* that Title VII of Civil Rights Act of 1964, the Rehabilitation Act of 1973, and Title I of the Americans with

---

2. Indeed, plaintiff acknowledges that he was sleeping on duty on this occasion and other occasions and was repeatedly AWOL during the course of his employment. *See* Def. Ex. B at 80–82 (plaintiff's deposition).

3. However, plaintiff does not support this assertion with any specific citation to the record. While the Court does not treat this fact as conceded, as discussed below, it is undis-

puted that the termination process was initiated before plaintiff's contact with the EEOC office.

4. Plaintiff moved for leave to file an amended complaint because he had not named the proper defendant. The Court granted the motion on May 17, 2001.

Disabilities Act of 1990 ("ADA") apply to the legislative branch of the federal government. 2 U.S.C. § 1302. The Act provides that "[a]ll personnel actions affecting covered employees shall be made free from any discrimination based on . . . disability, within the meaning of section 501 of the Rehabilitation Act . . . and sections 102 through 104 of the Americans with Disabilities Act of 1990 . . . ." 2 U.S.C. § 1311(a)(3). The Act also prohibits intimidation and reprisal against an employee "because the covered employee has opposed any practice made unlawful by this chapter, or because the covered employee has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceeding under this chapter." 2 U.S.C. § 1317(a).[5]

▰ Plaintiff specifically alleges that defendant violated the Rehabilitation Act and the ADA. The three-part "shifting burdens" test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is applicable.[6]

> First, the plaintiff has the initial burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." [*McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons of-

fered by the defendant were not its true reasons, but were a mere pretext for discrimination.

*Id.* at 804, 93 S.Ct. 1817. *See also Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the defendant has proffered non-discriminatory reasons for the termination, the plaintiff must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). "It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason.'" *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996) (citing and quoting *Pignato v. American Trans Air, Inc.*, 14 F.3d 342, 349 (7th Cir.1994)). "Filing a Title VII action . . . is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or insubordination." *Gregg v. Hay–Adams Hotel*, 942 F.Supp. 1, 9–10 (D.D.C.1996). "Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach*, 86 F.3d at 1183 (quotation marks and citation omitted). *See also Vasilevsky v. Reno*, 31 F.Supp.2d 143, 149 (D.D.C.1998) ("[P]laintiff must do more than just deny or criticize the proffered reasons of the defendant.").

---

**5.** The term "covered employee" includes any employee of the Office of the Architect of the Capitol. 2 U.S.C. § 1301(3)(F).

**6.** "In an ADA case with no direct evidence of discrimination and where the defendant denies that its decisions were motivated by the

plaintiff's disability, this court applies ·the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green* . . . ." *Duncan v. WMATA*, 240 F.3d 1110, 1114 (D.C.Cir. 2001) (en banc) (citation omitted).

However, as the D.C. Circuit has noted, "the *Burdine* test is not equally applicable to all cases" alleging disability discrimination. *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C.Cir.1993). "To illustrate this point, [the Court] describe[d] three of the various categories of handicap discrimination cases that may be brought[:]"

> The first is one in which the employing agency asserts that it refused a job application, or denied an employee a promotion or discharged him, for reasons unrelated to the person's handicap.... A second category involves suits in which the employer challenges a plaintiff's claim that he is a "qualified handicapped person" who, with "reasonable accommodation, can perform the essential functions of the position in question." ... In these cases, the agency will usually contend that no reasonable accommodation is available.

*Id.*[7] While defendant argues that plaintiff was disciplined and terminated for his repeated AWOLs and sleeping on the job, and not for his disability, plaintiff appears to argue that his conduct was a result of his disabilities. Under plaintiff's theory, this case would fall into the second category, where plaintiff bears the burden of establishing that he is a "qualified handicapped person" who, with "reasonable accommodation, can perform the essential functions of the position in question." *Id.*

The Court will address the case under both theories.

**A. Discrimination**

To establish a prima facie case of disability discrimination, plaintiff must prove that "he had a disability within the meaning of the ADA, that he was 'qualified' for the position with or without a reasonable accommodation, and that he suffered an adverse employment action because of his disability." *Duncan*, 240 F.3d at 1114 (citing *Swanks v. WMATA*, 179 F.3d 929, 934 (D.C.Cir.1999)). *See also Barth*, 2 F.3d at 1186 (Under the Rehabilitation Act, "a plaintiff must establish that (a) he is handicapped but, (b) with reasonable accommodation (which he must describe), he is (c) able to perform 'the essential functions' of the position he holds or seeks ... As in the usual case, it would then be up to the employing agency to refute that evidence. The burden, however, remains with the plaintiff to prove his case by a preponderance of the evidence.").[8] Plaintiff's Complaint and Amended Complaint allege seven counts of discrimination[9] based on a July 30, 1998 Disciplinary Incident Report relating to the events of July 29, 1998, an August 5, 1998 Disciplinary Incident Report, an August 12, 1998 Disciplinary Incident Report, a September 2, 1998 Disciplinary Incident Report, the October 13, 1998 proposal to terminate, and his March 5, 1999 termi-

---

**7.** The third category described by the Court of Appeals, cases "in which the employing agency offers the affirmative defense [that the accommodation would constitute] 'undue hardship' on the operation of its program," is not relevant here. *Id.*

**8.** Defendant does not dispute for the purposes of this motion that plaintiff was disabled.

**9.** While the complaint also seems to allege that defendant subjected plaintiff to an "abrasive and hostile work environment" due to his

disabilities, plaintiff's allegations that Barankowski awakened him on July 29, 1998, by dropping a metal dustpan on the tile floor behind where plaintiff was sleeping, that he received Disciplinary Incident Reports when he was AWOL, and that his supervisor was disrespectful to him are insufficient as a matter of law to establish "harassment so severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Henry v. Guest Services, Inc.*, 902 F.Supp. 245, 252 n. 9 (D.D.C.1995) (adopting Title VII standard for ADA cases).

nation.[10] It is beyond dispute that both showing up when scheduled for duty and staying awake while on duty are essential functions of a BPW position. Plaintiff does not even bother to explain what reasonable accommodation should have been granted him that would have enabled him to perform these essential functions of the position. Plaintiff also does not cite to any evidence in the record to support his assertion that his skin medication made him drowsy, causing him to sleep on the job, or that his repeated AWOLs were due to his disabilities. Even assuming arguendo that sleeping on the job were a result of the medication that plaintiff took for his skin disorders, plaintiff testified in his deposition that his AWOLs were the result of a variety of problems in his life, and not just his medical problems. Def. Ex. B at 106–07, 111, 150–51. Therefore, plaintiff has failed to establish a prima case, since he has not shown that he was able to perform the essential functions of his job with or without any reasonable accommodation, or that he was disciplined and terminated because of any disability. The Court will therefore grant summary judgment on these claims.

■ Moreover, to the extent that plaintiff may be arguing that although his AWOLs were not caused by his disability, they constituted a pretextual or "phony" reason for his discipline and termination, plaintiff has submitted no evidence to support such an argument.[11] *See Fischbach,* 86 F.3d at 1183; *Vasilevsky,* 31 F.Supp.2d at 149. Plaintiff does not dispute that he was AWOL on repeated occasions and offers no evidence that this was not the true reason for his discipline and termination. Plaintiff's conclusory allegations that he was disciplined and terminated solely because of his disabilities are wholly insufficient to rebut defendant's overwhelming evidence that the defendant had more than good cause to discipline and terminate him for his repeated failure to report to work.

## B. Retaliation

■ In order to establish a prima facie case of retaliation, plaintiff must demonstrate: (1) that he engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two. *Brody,* 199 F.3d at 452. Plaintiff alleges three counts of retaliation consisting of a September 2, 1998 Disciplinary Incident Report, the October 13, 1998 proposal to terminate, and his

---

**10.** While these Disciplinary Incident Reports are referenced in the record, copies have not been submitted to the Court. The July 30, 1998 Report was issued based on sleeping during duty hours, and the August 5, 1998 and August 12, 1998 Reports were based on plaintiff's being 8 hours AWOL on each date. *See* Def. Ex. O; *see also* Def. Ex. M ¶ 6. The Court has not been able to locate any evidence in the record relating to a September 2, 1998 Disciplinary Incident Report, other than the allegations of plaintiff's unverified complaints and unsigned affidavit. It is not clear to the Court whether these disciplinary incident reports are "adverse actions" within the meaning of *Brown v. Brody,* 199 F.3d 446, 457 (D.C.Cir.1999) (plaintiff must show an action with "materially adverse consequences affecting the terms, conditions, or privileges

of employment"), but since defendant does not make this argument, the Court will assume for the purposes of this motion that they constitute adverse actions.

**11.** If plaintiff does not contend that the AWOLs themselves were a result of his disabilities, he bears the burden of showing, for the purposes of a prima facie case, that he was disciplined and terminated for the AWOLs because of his disabilities, either by demonstrating disparate treatment (that similarly situated non-disabled persons were not disciplined) or that the actions otherwise occurred under circumstances that would give rise to an inference of discrimination. Plaintiff has failed to make such a showing.

termination. Plaintiff argues that these events followed his September 1, 1998 initiation of counseling or mediation with the Office of Equal Opportunity and Conciliation Programs ("EEO/CP") and were therefore retaliatory. Plaintiff also argues that they followed his use of leave to attend counseling at the "Vet Center" of the Department of Veterans Affairs, and his participation in a residential substance abuse treatment program, which he claims constituted "reasonable accommodations" and protected activity sufficient to serve as the basis for a retaliation claim. As an initial matter, plaintiff's use of sick leave to obtain treatment for his disabilities would not rise to the level of a reasonable accommodation. Even if it did, however, requesting or utilizing reasonable accommodations does not constitute statutorily protected activity within the meaning of the Congressional Accountability Act, which prohibits retaliation against an employee "because the covered employee has opposed any practice made unlawful by this chapter, or because the covered employee has initiated proceedings, made a charge, or testified, assisted, or participated in any manner in a hearing or other proceeding under this chapter." 2 U.S.C. § 1317(a). Therefore, plaintiff first engaged in protected activity within the meaning of the Act on September 1, 1998.

Plaintiff has failed to establish any causal connection between his September 1, 1998 protected activity and the three adverse actions he alleges. While the October 13, 1998 proposal to terminate and the March 5, 1999 termination both follow the September 1 contact with EEO/CP, it is undisputed that the termination process was initiated on August 18, 1998 when Gibson requested a proposed termination for plaintiff's failure to properly schedule leave in advance and failure to report for duty at his assigned time. Def. Ex. O;

Def. St. of Facts ¶ 11. Because the termination process had already been initiated, following on the heels of repeated warnings and progressive disciplinary actions, no reasonable juror could conclude that the termination had been caused by the September 1 activity. In addition, there is no evidence that the September 2, 1998 Disciplinary Incident Report was issued by an individual who "had knowledge of the protected activity." *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985). Therefore, plaintiff has failed to establish a prima facie case of retaliation.

Moreover, even assuming that plaintiff could establish a prima facie case, defendant has presented more than ample evidence that the discipline and termination were due to plaintiff's repeated AWOLs and not any protected activity. As discussed above, plaintiff has not disputed that he was persistently AWOL and has offered no evidence to suggest that defendant's explanation for the discipline and termination was pretextual. Therefore the Court will grant defendant summary judgment on plaintiff's retaliation claims.

### C. Plaintiff's Other Arguments

Although plaintiff's complaints allege disability discrimination and retaliation, instead of arguing that he has established a prima facie case of either or offering any evidence that defendant's stated reasons for disciplining and terminating him were pretextual, plaintiff instead provides a rambling dissertation regarding defendant's personnel system in an attempt to argue that his termination was procedurally and constitutionally invalid. These arguments are irrelevant to the claims in his complaints. The first argument is that defendant's acts of discipline and termination were ultra vires and unlawful because defendant had no

authority to discipline or terminate plaintiff in the absence of a formal leave policy as mandated by 40 U.S.C. § 166b–7(c)(2)(H).[12] This claim, which is without any basis in law, was never included in any of plaintiff's complaints and fails entirely to remedy the glaring shortcomings of his claims of discrimination and retaliation under the Congressional Accountability Act, which are the only claims before the Court.[13] The second argument is that defendant violated plaintiff's due process rights by terminating his employment based on an unconstitutionally vague leave policy. This claim is similarly absent from the complaints, and as argued by defendant, is unsupported by the law and the evidence. More importantly, given the irrelevance of this argument to the claims in plaintiff's complaints, it must be rejected.

## CONCLUSION

For the foregoing reasons, the Court concludes that the plaintiff cannot prevail on a claim of discrimination or retaliation under the Congressional Accountability Act. Accordingly, summary judgment is granted for the defendant.

---

12. That section provides that "the Architect of the Capitol [is required] to establish and maintain a personnel management system that incorporates fundamental principles that exist in other modern personnel systems" including "[a] formal policy statement regarding the use and accrual of sick and annual leave which shall be made known to all employees." 40 U.S.C. § 166b–7(c)(2)(H).

13. Plaintiff cites a number of cases in support of this argument that stand generally for the proposition that regulations issued pursuant to legislatively granted authority must be consistent with the statute granting such authority and within the scope of that delegated authority. There are no legislative regulations promulgated by the AOC, pursuant to 40 U.S.C. § 166b–7 or otherwise, at issue in this case. Plaintiff also makes reference to "Standards of Conduct" established in 1989, which do not appear to have anything to do with the accrual or use of leave.