**Elena COLES, Plaintiff,**

v.

**KELLY SERVICES, INC., Defendant.**

**No. CIV.A. 02–1828RMC.**

United States District Court,
District of Columbia.

Oct. 17, 2003.

Elena Coles, Silver Spring, MD, pro se.

Christina A. Volzer Bailey, McGuire Woods, LLP, McLean, VA, for Defendant.

## MEMORANDUM OPINION

COLLYER, District Judge.

Pending before the Court is Kelly Services, Inc.'s ("Kelly Services") motion for summary judgment. Elena Coles, who is proceeding *pro se*, opposes this motion.[1] At issue is whether Kelly Services violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), by allegedly subjecting Ms. Coles to sexual harassment and then discharging her after she complained. Having carefully considered the parties' briefs and accompanying materials, the Court grants Kelly Services's motion for summary judgment and dismisses the complaint.[2]

## I.  BACKGROUND [3]

Kelly Services, a temporary employment agency, hired Ms. Coles on September 6, 2000, and placed her as a medical clerk/receptionist in the Infectious Disease Clinic ("Clinic") at Walter Reed Army Medical Center ("WRAMC" or "Walter Reed").[4]  At the time of the relevant events, Kelly Services maintained a management office in Building 1 at WRAMC, which was within immediate walking distance of the Clinic.  Ms. Coles visited that office each Friday to turn in her timecard.  Kelly Services's on-site supervisors were Linda Pree and Mona Ghounem.  Ann DeSoto, a Supervisory Administrative Coordinator at the Clinic, oversaw Ms. Coles's work and usually signed her weekly timecard.  *See* Pl. Opp. Ex. 4.

In April 2001, Sgt. Gregory Lawrence became the Non–Commissioned Officer in Charge of the Clinic.  Sgt. Lawrence interacted with Ms. Coles on a daily basis, although he did not possess any supervisory authority over her.  Ms. Coles alleges that Sgt. Lawrence sexually harassed her beginning on May 24, 2001.  Specifically, she claims that he sent her between five and ten sexually-explicit e-mails from May 24 until June 25, 2001, and described a

---

1. Although Ms. Coles is technically a *pro se* plaintiff, it is quite clear from the form and content of her briefs that she has received substantial legal assistance in this case.  *See* Def. Reply at 2 n. 2.

2. Also pending is Ms. Coles's motion to preclude portions of the independent medical examiner's report.  Because the Court did not rely on this report in making its decision, this motion is denied as moot.

3. The facts are undisputed, except where noted.  The Court quotes liberally from Ms.

Coles's deposition to put the case forward in her own words.

4. Ms. Coles previously worked at WRAMC under a different contract company in 1998.  During that employment, she complained of sexual harassment while assigned to the Dermatology Clinic.  As a result, Ms. Coles was transferred to the Infectious Disease Clinic, where she worked with Charles Ansley, a Health System Specialist.  In August 2000, Mr. Ansley invited her to apply to Kelly Services to return to Walter Reed.

sexual encounter in front of her.[5] Coles Dep. at 96–97, 104. When Ms. Coles made it clear that she wanted this behavior to cease, she asserts that Sgt. Lawrence began to make physically threatening gestures toward her and that he swore at her and used profanity. For example, on July 3, 2001, Ms. Coles observed a patient waiting for Sgt. Lawrence to take his blood pressure. When she reminded Sgt. Lawrence that the patient was waiting for him, Sgt. Lawrence allegedly spoke rudely and harshly to her. Pl. Opp. Ex. 10.

These matters came to a head on Friday, July 6, 2001. That morning there was just "normal clinic business[.]" Coles Dep. at 120. Later, however, as described by Ms. Coles,

> [Around 3:30 p.m.,] I went into the waiting room, and a tennis match was on. So I was just sitting there briefly. [Sgt. Lawrence] came in, and he told me that he was watching something. I told him that no one was in the waiting room while I was there. He went on over to the television and turned it off. I told him that he was being rude, so I turned it back on. It just continued back and forth. He made a threatening gesture towards me, and told me to get the f—— out.

*Id.* at 122–23. At this point, Ms. Coles decided to report Sgt. Lawrence's behavior, which she had not done previously. She immediately went to see Mr. Ansley, complaining about sexual harassment by Sgt. Lawrence and describing his conduct

that she considered threatening. Mr. Ansley was "busy at the moment" and told Ms. Coles to wait in his office, during which time she called the Kelly Services office in Building 1. *Id.* at 125. She states that she informed the receptionist at Kelly Services that she "was being sexually harassed and threatened" and that she wanted to speak with either Ms. Pree or Ms. Ghounem. *Id.* at 128. "The receptionist said they were unavailable and to call back on Monday, July 9." *Id.* at 130. Mr. Ansley returned to his office shortly after Ms. Coles concluded her call.

In the meantime, Sgt. Lawrence reported a very different version of the July 6th encounter to his superiors at WRAMC.[6] In a memorandum prepared on July 6, 2001, Sgt. Lawrence wrote that he was watching television in the waiting room when Ms. Coles entered the room and changed the channel:

> I then said, "Ms. Coles, what are you doing, do you see me in here watching television?" Ms. Coles then said, "[*sic*] I want to watch the tennis match." Then I said "No, I was watching television and that is rude to come in here and change the channel while I was watching television." As I tried to change the channel Ms. Coles smacked my hands. I then said to her "Ms. Coles, please do not touch me again." I then tried to change the channel again, and a second time Ms. Coles smacked my hands down. I told Ms. Coles "No

---

**5.** In her opposition brief to Kelly Services's motion, Ms. Coles asserts for the first time that Sgt. Lawrence also expressed interest "in adding her to his numerous sexual conquests." Pl. Opp. at 4. This allegation was not made previously or described during Ms. Coles's deposition, which was an exhibit to her opposition brief and has been reviewed in full by the Court. Kelly Services objects to this and other new allegations made for the first time in the opposition brief. Def. Reply

at 13–14. The Court has determined that none of the new allegations is material to the disposition of this matter.

**6.** For purposes of resolving Kelly Services's motion, the Court will give Ms. Coles the benefit of all inferences in her favor and will credit her description of the event. However, it is clear that Sgt. Lawrence's superiors were told a different story.

one was watching television and that she needed to leave the lounge area so that I could lock up the lounge." Ms. Coles then said to me "You are the most ghetto and ignorant bastard that I have ever met." I then said "Thank you Ms. Coles."

... I reported this to Dr. [Clifton] Hawkes[, Chief of the Infectious Disease Service,] and [said] that I could no longer work with Ms. Coles.

Pl. Opp. Ex. 8. While Ms. Coles was talking with Mr. Ansley, Sgt. Lawrence was meeting with Dr. Hawkes. Ms. Coles later spoke to Dr. Hawkes by telephone from her home. She reported her allegations of sexual harassment and threatening behavior and profanity directed toward her by Sgt. Lawrence. Dr. Hawkes stated that he wanted to arrange a meeting for Ms. Coles, Sgt. Lawrence and himself to discuss the situation and improve their ability to work together. Ms. Coles responded that she had to prepare a written statement and have one of her supervisors from Kelly Services in attendance. When Dr. Hawkes suggested that she not involve Kelly Services, Ms. Coles insisted that, based on Kelly Services's policy, all allegations of harassment must be reported.

On Sunday, July 8, 2001, Mr. Ansley contacted Ms. Coles at her home and purportedly encouraged her not to write a statement or to report sexual harassment by Sgt. Lawrence. Ms. Coles informed Mr. Ansley that she was afraid of Sgt. Lawrence and that she was not going to return to WRAMC until she had reported sexual harassment to Kelly Services.

When Ms. Coles called Kelly Services to speak with either Ms. Ghounem or Ms. Pree on Monday morning, July 9th, they were again unavailable and she left a message "stating that she was not going to be at work because she did not feel safe being around Sgt. Lawrence." Pl. Opp. at 7. She also called Ms. DeSoto at 6:00 a.m. that morning to inform Ms. DeSoto that "she was supposed to come in for a meeting with Dr. Hawkes, but that she had been unable to get in contact with her Kelly Services supervisors Mona Ghounem and Linda Pree." Id. at 8. In that conversation, Ms. Coles related the incident of July 6th, but did not describe any of the other alleged harassment or threats. Coles Dep. at 150–51; Pl. Opp. Ex. 12. Ms. Coles spoke with Mr. Ansley on Monday, as well, telling him that she would not be in to work because she had not yet spoken with her supervisors at Kelly Services. Coles Dep. at 151–52. She called Dr. Hawkes in the afternoon of July 9th to give him the same message. Id. at 152. During Ms. Coles's conversation with Dr. Hawkes, he told her that Kelly Services had fired her because of a timecard discrepancy for lunch on Friday, July 6, 2001. Coles Dep. at 153–56. Ms. Coles responded that it was strange that there was a sudden timecard discrepancy right after she had registered a complaint regarding sexual harassment. Id. She did not hear from Kelly Services on that day, however, so she was unable to confirm her employment status.

On that same Monday, July 9, 2001, Ms. DeSoto contacted Ms. Ghounem at Kelly Services and informed Ms. Ghounem that Ms. Coles had falsified her timecard,[7] had

7. Ms. DeSoto was not at work on July 6, 2001, but called in several times that day to ensure that the Clinic was operating smoothly. Pl. Opp. Ex. 12. During her call at 2:30 p.m., Sgt. Lawrence answered the telephone and informed Ms. DeSoto that Ms. Coles had left for lunch at 11:30 a.m. and had not yet returned. Ms. Coles's timecard for July 6, 2001, indicated "no lunch" and a full workday of nine hours. Pl. Opp. Ex. 4 at 100593. The timecard was approved by Mr. Ansley in the morning of July 6th and Ms. Coles delivered it to the Kelly Services office in Building 1 around noon.

been rude to patients and co-workers, and had slapped a co-worker's hand.[8] Pl. Opp. Ex. 19. Ms. DeSoto also told Ms. Ghounem that Ms. Coles had resigned her assignment at the Clinic; Ms. DeSoto asked Kelly Services to send a replacement. *Id.* Thereafter, Kelly Services marked its records that Ms. Coles's placement at WRAMC had terminated.

On the evening of July 9, 2001, Mr. Ansley again called Ms. Coles twice at her home to discuss why she had been terminated. According to Ms. Coles, Mr. Ansley acknowledged that there was no time card discrepancy but stated that he had reported such a discrepancy to Kelly Services because she had insulted the Clinic by wanting to report sexual harassment. Coles Dep. at 162 ("He told me that there was no timecard discrepancy, that he lied and told Kelly Services that there [was a] timecard discrepancy. He was telling me the reason why he told them that was because I insulted the Infectious Disease Clinic by wanting to write a statement and wanting to notify Kelly Services.").

Ms. Coles finally spoke with Ms. Ghounem at Kelly Services on July 10, 2001. She reported the foregoing events without details, including her conversations with Mr. Ansley on July 9th. *Id.* at 187, 194 ("I didn't really go into details with her .... I didn't really go into detail; I said I was being sexually harassed."). Ms. Ghounem told Ms. Coles that Kelly Services had been informed that she had quit, that there was a discrepancy with her timecard, that Walter Reed was concerned about Ms. Coles's attitude towards patients and co-workers, that patients had complained about her, and that she had slapped a co-worker. *Id.* at 188–91. Ms. Coles responded that none of these things was accurate, but Ms. Ghounem allegedly "said

that was what Walter Reed told her, so she was going by what Walter Reed told her." *Id.* at 190. Ms. Ghounem also allegedly stated that Ms. Coles "was no longer an employee of Kelly Services, that [she] was no longer active in their computer system, and that they were not going to investigate [her] complaint." *Id.* at 178–79. Ms. Coles recounts Ms. Ghounem's explanation that "they could not investigate because they were non-government and they only had a contract." *Id.* at 198.

Ms. Ghounem asserts that Ms. Coles's assignment at Walter Reed was terminated effective July 9, 2001, which she told Ms. Coles, but that Ms. Coles remained eligible for future assignments through Kelly Services. Pl. Opp. Ex. 23. Ms. Coles contends that Ms. Ghounem did not tell her that she was eligible to work for Kelly Services's other clients. Coles Dep. at 199. Kelly Services's Employee Record on Ms. Coles states, "KE resigned on 7–6–01. KE is not eligible for rehire at Walter Reed but is eligible for rehire with Kelly Services. The Dept failed to inform us that the KE was rude to patients and co-workers, and KE was forging her timecard." Pl. Opp. Ex. 3 at 100028. That record also states, "KE resigned from the assignment due to conflict KE was having within the Dept." *Id.* at 100031. The parties agree that Kelly Services contacted Ms. Coles on three later occasions about other assignments, but that she did not return those telephone calls. Coles Dep. at 204 ("I was fired so I didn't need to respond to any calls."). Ms. Coles asserted in her deposition that she did not realize Kelly Services places individuals at locations other than Walter Reed. *Id.* at 209.

On July 13, 2001, Ms. Coles filed a complaint with the Equal Employment

---

8. At the time of this conversation, Ms. DeSoto attests that she "was not aware of any allegations of sexual harassment made by Ms. Coles against Sgt. Lawrence." Pl. Opp. Ex. 19.

Opportunity Commission ("EEOC") against Kelly Services for sexual harassment and retaliation.[9] She alleges that Kelly Services discriminated against her when she was told on July 10, 2001, that "they were not going to investigate my complain[t] of sexual harassment and threats, that I was no longer a Kelly [Services] employee and that I was no longer active in the computer system," but that Kelly Services did not discriminate against her before that date. Coles Dep. at 242. Ms. Coles brought this lawsuit on September 16, 2002, seeking damages under Title VII.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). This remedy is not a "disfavored legal shortcut[;]" rather, it is a reasoned and careful way to resolve cases fairly and expeditiously. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether a genuine issue of material fact exists, the Court must view all facts and reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994). To be "material" and "genuine," a factual dispute must be capable of affecting the substantive outcome of the case. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505; *Laningham v.*

*United States Navy*, 813 F.2d 1236, 1242–43 (D.C.Cir.1987).

In employment discrimination cases under Title VII—in the absence of direct evidence of discrimination—courts apply the burden-shifting scheme set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that framework, the plaintiff must first establish by a preponderance of the evidence a *prima facie* case of discrimination or retaliation. If successful, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. Ultimately, the plaintiff must prove by a preponderance of the evidence that the employer's stated reason was merely pretextual. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

## III. ANALYSIS

### 1. Sexual Harassment

The first count of the complaint avers that Kelly Services "creat[ed], condon[ed], and benefit[ed] from perpetuating a sexually hostile work environment" in violation of Title VII. Compl. ¶ 56. A hostile work environment exists only "when the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399,

---

**9.** Ms. Coles contacted the EEOC on July 13, 2001, to file a charge against Walter Reed. Because Walter Reed is part of the federal government, the EEOC instructed her to follow the internal agency equal employment opportunity ("EEO") process. Ms. Coles ini-

tiated that process on July 17, 2001, which resulted in a hearing in August 2003. Kelly Services was not invited to participate in that hearing. The record is unclear as to whether that matter has been resolved.

91 L.Ed.2d 49 (1986)). "Not all abusive behavior, even when it is motivated by discriminatory animus, is actionable." *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C.Cir.1999).

■ Ms. Coles contends that Sgt. Lawrence sexually harassed her when he forwarded up to ten sexually-explicit e-mails [10] and had a conversation in front of her about his sexual encounter with another woman.[11] However, " 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.' " *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)) (citation omitted); *see also Kidane v. Northwest Airlines, Inc.*, 41 F.Supp.2d 12, 16 (D.D.C. 1999) ("[T]hough remarks such as these, if true, doubtless are discriminatory and inappropriate, such isolated remarks are not sufficient to state a claim of hostile work environment under Title VII."). As a matter of law, Sgt. Lawrence's allegedly discriminatory conduct, although certainly offensive and unprofessional, was not severe or pervasive enough to rise to the level of a hostile work environment.

■ Even assuming a hostile work environment, Kelly Services is not legally responsible for Sgt. Lawrence's alleged sexual harassment because the company took what reasonable remedial measures it could under the circumstances. "An employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and *failed to implement prompt and appropriate corrective action.*" *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C.Cir.1999) (emphasis added); *see Martin v. Howard Univ.*, No. 99–1175, 1999 WL 1295339, *——, 1999 U.S. Dist. LEXIS 19516, at *7 (D.D.C. Dec. 16, 1999). Kelly Services maintains a clear policy against sexual harassment with which Ms. Coles was familiar. That policy "requires that an employee immediately notify his or her manager or a human resources representative if he or she believes he or she is being subjected to sexual harassment or offensive conduct." Def. Mot. for Summ. J. at 2 n. 1. Ms. Coles visited the Kelly Services office at Building 1 of WRAMC every week with her timecard and never mentioned the alleged harassment. Thus, the earliest Kelly Services knew or should have known of the alleged sexual harassment was July 6th, when Ms. Coles first took steps to notify her supervisors at Kelly Services.[12]

"Appropriate corrective action" is that which is reasonably designed to stop co-worker harassment. *See Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.

---

**10.** Of the three e-mails provided to the Court, two were sent to a larger group of people and not just Ms. Coles. *See* Pl. Opp. Ex. 7.

**11.** The allegations of threatening gestures, reading Ms. Coles's private e-mail, and using profanity have not been shown to be related to Ms. Coles's gender. The angry encounters between Ms. Coles and Sgt. Lawrence on July 3 and 6, 2001, also have no apparent sexual overtones. *See Bryant v. Brownlee*, 265 F.Supp.2d 52, 62–64 (D.D.C.2003).

**12.** Ms. Ghounem did not actually learn of the alleged sexual harassment until July 10, 2001. However, it is arguable that Kelly Services was notified of Sgt. Lawrence's purported misconduct on July 6th, when Ms. Coles left a message with a receptionist. While it is true that Ms. Coles neither visited the Kelly Services office in Building 1 nor left any direct voice messages, the Court assumes the truth of Ms. Coles's statement that she left a message.

1992), *aff'd*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). It is undisputed that WRAMC told Kelly Services on July 9, 2001, that Ms. Coles had quit her job after complaints about her performance and time records. Based on that conversation—which occurred just one business day after Ms. Coles first contacted Kelly Services to complain about Sgt. Lawrence—there would be no further sexual harassment for the company to rectify with respect to her.[13] *See generally EEOC v. Barton Protective Servs., Inc.*, 47 F.Supp.2d 57, 61 (D.D.C.1999). Believing that Ms. Coles had voluntarily extricated herself from the situation and that WRAMC had cause to replace her, there was really nothing more Kelly Services could be expected to do for her protection.[14] Under these circumstances, the Court finds that Kelly Services did not fail to take appropriate measures toward ending the sexual harassment allegedly directed at Ms. Coles.

### 2. Retaliation

Ms. Coles's second claim alleges that Kelly Services terminated her employment in retaliation for her reporting sexual harassment. To establish a *prima facie* case of retaliatory discharge under Title VII, Ms. Coles must show "1) that [she] engaged in a statutorily protected activity; 2) that the employer took an adverse personnel action; and 3) that a causal connection existed between the two." *Morgan v. Fed. Home Loan Mortg. Corp.*, 328 F.3d 647, 651 (D.C.Cir.2003) (quoting *Mitchell*

*v. Baldrige*, 759 F.2d 80, 86 (D.C.Cir.1985)) (internal quotation marks omitted). Kelly Services argues that Ms. Coles did not suffer an adverse employment action and that there is no causal connection between her complaint of sexual harassment and her alleged discharge. Further, Kelly Services articulates what it believes is a legitimate, nondiscriminatory reason for its conduct.

In the context of this summary judgment motion and because Ms. Coles is proceeding *pro se*, the Court is especially attentive to all legitimate and fair inferences that should be drawn in her favor. With respect to the issue of whether Kelly Services took an adverse employment action against Ms. Coles, for instance, it might fairly be concluded at this stage of the litigation that Ms. Ghounem told Ms. Coles on July 10, 2001, that she was "terminated" because that is what the computer report indicates and because the record says Ms. Coles is subject to "rehire" rather than "reassignment." Since Ms. Coles apparently did not appreciate that Kelly Services provides temporary employees at locations other than Walter Reed, she therefore did not realize that other assignments might exist. Accordingly, the Court finds that there is a genuine dispute over whether Ms. Coles was discharged from Kelly Services, was merely reassigned from Walter Reed, or resigned. For purposes of this motion and without deciding the issue, the Court will treat this termination-with-rehire as an adverse employment action and hereafter analyze the case

---

13. It appears that Kelly Services began some remedial action. Rebecca Conkin, a Kelly Services Branch Manager, stated in her affidavit that she contacted Franchise Business Activity–East ("FBA–East"), to which Kelly Services was a subcontractor for work at Walter Reed, and asked that company to pursue her allegations directly with its client, WRAMC. Conkin Aff. ¶ 8. FBA–East assured Ms. Conkin that it would do so. *Id.; see also*

Coles Dep. at 213 (acknowledging that Ms. Coles did not know what Kelly Services did to investigate her allegations).

14. In fact, Kelly Services called Ms. Coles three times after July 2001 about other assignments. Although Ms. Coles questions the sincerity of those calls, she never tested them by calling back.

as if Kelly Services discharged Ms. Coles on July 10, 2001.

■ Turning to the causal connection element under *Mitchell*, "[t]he plaintiff must make a prima-facie case showing that the adverse action would not have occurred 'but for' [her] participation in the protected activity." *Sanders v. Veneman*, 211 F.Supp.2d 10, 21 (D.D.C.2002); *see also Williams v. Boorstin*, 663 F.2d 109, 117 (D.C.Cir.1980) (pre-Civil Rights Act of 1991 case); *but see Porter v. USAID*, 240 F.Supp.2d 5, 7 (D.D.C.2002). Kelly Services asserts that, on July 9, 2001, Ms. DeSoto advised it that Ms. Coles had quit and that WRAMC had issues with Ms. Coles's performance and time-keeping. Ms. DeSoto confirms this, adding that "[a]t the time [Ms. DeSoto] called Ms. Ghounem about Ms. Coles, [Ms. DeSoto] was not aware of any allegations of sexual harassment made by Ms. Coles against Sgt. Lawrence." Pl. Opp. Ex. 25. This communication is uncontested.[15] Because Kelly Services has demonstrated that it "would have made the same decision in the absence of the unlawful motive[,]" the Court cannot say that retaliation was the "but for" cause of Ms. Coles's termination. *Borgo v. Goldin*, 204 F.3d 251, 255 n. 6 (D.C.Cir.2000).

Even assuming a *prima facie* case of retaliation, Kelly Services has propounded a legitimate, nondiscriminatory reason for discharging Ms. Coles and there is no evidence to suggest that this reason was a pretext for retaliation. Walter Reed reported to Kelly Services that Ms. Coles had slapped a WRAMC employee, had been rude to patients, and had submitted a false timecard. Pl. Opp. Ex. 23. "[I]n the burden-shifting context, 'pretext' is shown not through evidence that an employer's proffered reasons are inaccurate or incorrect, but through evidence that an employer's proffered reasons are false or a lie." *Hanna v. Herman*, 121 F.Supp.2d 113, 118 (D.D.C.2000). The reason why Kelly Services removed Ms. Coles from WRAMC may have been based on faulty information, as argued by Ms. Coles, but it is clear that WRAMC complained about Ms. Coles's conduct and also notified Kelly Services that she had quit. Ms. DeSoto's conversation with Ms. Ghounem on July 9, 2001, which conveyed this information, certainly provided Kelly Services with a non-retaliatory basis for terminating Ms. Coles—either from Kelly Services's employment or from the assignment at Walter Reed—that same day.

■ Ms. Coles attempts to show that Kelly Services's stated reason for terminating her was pretextual by asserting that 1) "if Ms. Coles had resigned there would be no reason for Kelly Services to have to take action to remove Ms. Coles from her position"; 2) "Kelly Services' representation that Ms. Coles was told that she remained eligible for placement with the U.S. Courts after it removed Ms. Coles from her employment ... is outrageous, a complete lie and illogical"; and 3) "[t]he support for Kelly Services' removal of Ms. Coles is suspect and insufficient[.]" Pl. Opp. at 25–26. These points are insufficient to support the argument that Kelly Services's explanation for taking the adverse employment action was false or a lie. *See Woodruff v. Dimario*, No. 01–5321, 2002 WL 449776, *1, 2002 U.S.App. LEXIS 4326, at *2 (D.C.Cir. Feb. 21, 2002) (unpublished opinion). In particular, the first two points are mere speculation, for which Ms. Coles offers no evidentiary sup-

---

15. Although Ms. Coles contests that she quit her job at Walter Reed, there is no doubt that Ms. DeSoto recounted those (allegedly false) facts to Ms. Ghounem on July 9, 2001.

port.[16] *See Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 844–45 (D.C.Cir.2001) ("[W]here the plaintiff claims discrimination and the defendant offers evidence of a legitimate reason for an adverse action, the burden shifts to the plaintiff to produce *evidence* rebutting the employer's legitimate reason.") (emphasis added). The final point, although based on affidavits and other statements, is irrelevant to this issue. Ms. Coles contends that Kelly Services's stated reason for her termination was pretextual because Ms. DeSoto did not have personal knowledge of Ms. Coles's alleged resignation. While the veracity of and factual basis for Ms. DeSoto's statements to Kelly Services on July 9, 2001, might be relevant in a lawsuit against *Walter Reed*, they have no bearing on Ms. Coles's retaliation claim against Kelly Services. In determining whether Kelly Services is liable for retaliating against Ms. Coles, it does not matter whether she actually resigned or had performance difficulties, only that Walter Reed communicated those facts to Kelly Services and Kelly Services relied upon them. Given Ms. Coles's failure to produce relevant evidence rebutting the legitimate, nondiscriminatory reason proffered by Kelly Services, this claim must be dismissed.

## IV. CONCLUSION

For the reasons stated above, the Court grants Kelly Services's motion for summary judgment, denies as moot Ms. Coles's motion to preclude portions of the independent medical examiner's report, and dismisses the complaint. A separate order accompanies this memorandum opinion.

16. These points are specious, as well. First, if Ms. Coles had resigned, Kelly Services undoubtedly would have had to make some administrative notation in its records officially "terminating" her assignment at Walter Reed. Second, even if Ms. Coles did not remain

### ORDER

For the reasons stated in the memorandum opinion that accompanies this order, it is hereby

**ORDERED** that Defendant's motion for summary judgment is **GRANTED**. It is

**FURTHER ORDERED** that Plaintiff's motion to preclude portions of the independent medical examiner's report is **DENIED** as moot. It is

**FURTHER ORDERED** that the complaint is **DISMISSED**. It is

**FURTHER ORDERED** that this order shall constitute a **FINAL JUDGMENT** in this case. This is a final appealable order. *See* FED. R. APP. P. 4(a).

**SO ORDERED.**

eligible for another assignment after July 2001, this point is immaterial because the Court has already decided to treat Kelly Services's employment action—whatever it was—as adverse.