**Ross A. CARTER, Plaintiff,**

v.

**Alan GREENSPAN, Chairman, Board of Governors of the Federal Reserve System, Defendant.**

**No. CIV.A. 03–1026(ESH).**

United States District Court, District of Columbia.

Feb. 19, 2004.

Ross A. Carter, Laurel, MD, for Pro se.

Katherine H. Wheatley, Federal Reserve System Board of Governors, Washington, DC, for Defendant.

## MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiff Ross Carter, an African–American male, was employed by the Board of Governors of the Federal Reserve System ("the Board") from December 1998 until May 1999. He has sued his employer, alleging sexual harassment, disparate treatment and retaliation in violation of Title VII of the Civil Rights Act of 1964, codified as amended at 42 U.S.C. § 2000e *et seq.* Defendant has moved for dismissal and summary judgment on the grounds that, *inter alia,* plaintiff has failed to present sufficient facts to establish a *prima facie* case of discrimination or retaliation. As explained more fully below, defendant's motion will be granted.

## BACKGROUND

Mr. Carter was hired as a Payroll Specialist at the Board in late December 1998. (Opp. at 3.) During the interview for the position, his supervisors Charles Thompson and Bruce Shamberger stressed the

importance of teamwork in the office. (*See* Compl. ¶ 6; Thompson Decl. ¶ 3; Shamberger Decl. ¶ 3.) By mid-March 1999, however, Mr. Carter's supervisors had concluded that he was unable and unwilling to work as a member of the Board's team. (Thompson Decl. ¶ 7; Shamberger Decl. ¶ 9.) He refused to be trained by anyone other than Mr. Shamberger, objected to being trained for the same tasks as a female coworker, and demanded that he be trained outside the presence of any of his colleagues. (Shamberger Decl. ¶ 5.) He frequently locked the door to his office, backed himself against hallway walls when passing others, and exhibited other behaviors that made his coworkers uncomfortable.[1] (*Id.* ¶ 5.)

His supervisors also expressed concern about his rate of absenteeism. In his first three months on the job he had taken a significant amount of unscheduled, and often unearned, leave. (*Id.* ¶ 7; Thompson Decl. ¶ 5.) Mr. Carter responds by explaining that he missed a week of work in January due to a stomach virus, and claims that Mr. Thompson encouraged some, and approved all, of his leave time. (Compl. ¶¶ 9, 87; Pl.'s Facts ¶ 5.)[2]

Mr. Shamberger and Mr. Thompson both counseled Mr. Carter several times about his antisocial behavior and excessive leave, but his work performance did not improve. (Thompson Decl. ¶ 6; Shamberger Decl. ¶ 8.) Thus, on March 24, Mr.

Thompson contacted Rena Carlton, an Employee Relations Specialist at the Board, to discuss procedures for terminating Mr. Carter's employment. (Thompson Decl. ¶ 7; Carlton Decl. ¶¶ 4–5.) Ms. Carlton advised Mr. Thompson that since Mr. Carter was still in a provisional period, he could be terminated if his supervisors determined that his performance and competencies indicated that he was unsuitable for continued employment, but suggested that Mr. Thompson meet with Mr. Carter first to discuss his performance deficiencies. (Carlton Decl. ¶ 7.)

At a meeting involving Mr. Carter, Mr. Thompson and Mr. Shamberger on March 29, Mr. Thompson informed Mr. Carter that management did not think he was a good fit for the position, and that if he failed to improve his teamwork and reduce his absences, he would be let go. (Compl. ¶ 26; Thompson Decl. ¶ 9.) After being reprimanded, Mr. Carter alleged that he had been sexually harassed by coworker Marcie Edwards during a training session in January. (Compl. ¶ 28; Shamberger Decl. ¶ 12.) He also claimed that Ms. Edwards had touched him inappropriately that morning. (Shamberger Decl. ¶ 12.)

To address Mr. Carter's harassment allegations, Mr. Thompson again contacted Ms. Carlton, who met with Mr. Carter on March 30, 1999. (Carlton Decl. ¶¶ 8–9.) She explained that "he had the right to report his allegations to the EEO office by

---

1. By declaration, his supervisor stated that Mr. Carter attempted to avoid any possibility of physical contact with coworkers, protecting "an unusual zone of privacy." (*Id.*) Mr. Shamberger indicated that several of Mr. Carter's female coworkers wrote a memorandum stating that they felt uncomfortable working with him because of his "strange behavior." (*Id.* ¶ 15.) He recounted an episode when Mr. Carter became extremely agitated when he discovered that a three-hole puncher (which was office property, although he had marked "DO NOT REMOVE FROM THIS

OFFICE") had been taken from his desk and borrowed by a coworker. (*Id.* ¶ 10.) Mr. Shamberger also described an incident in which Mr. Carter accused a female coworker (not Marcie Edwards) of inappropriately touching him when her hand brushed against his nose while they were talking. (*Id.* ¶ 15.)

2. Mr. Carter attached to his opposition copies of "FRB Leave Cards" with approval signatures on them to demonstrate that his time off was indeed approved.

contacting an EEO counselor," but "Mr. Carter declined to contact the EEO office, indicating instead that he thought a meeting among the parties would resolve the problem." (*Id.* ¶ 9.) Ms. Carlton therefore met with Mr. Carter, Ms. Edwards, and Mr. Thompson on March 31, at which time Mr. Carter identified three instances in which Ms. Edwards allegedly touched him inappropriately. (Compl. ¶ 30; Carlton Decl. ¶ 10; Thompson Decl. ¶ 12.)

According to the complaint, the first incidence of offensive conduct occurred during a January 1999 training session when he was "caressed on the knee by Ms. Edwards." (Compl.¶ 70.) In late February or early March, Ms. Edwards "placed her breast" on Mr. Carter's arm while instructing him on payroll duties. (*Id.* ¶ 81.) And then, on March 29, Mr. Carter was in Mr. Shamberger's office "looking for a particular payroll form when coworker Marcie Edwards placed her fingers on plaintiff's buttocks." (*Id.* ¶ 82.) While describing these incidents at the March 31 meeting, Mr. Carter became "emotional and agitated," while Ms. Edwards "vigorously denied any inappropriate touching and said she did not want to work with Mr. Carter if he was going to make allegations like that." [3] (Carlton Decl. ¶ 10.) Mr. Thompson suggested that Mr. Carter and Ms. Edwards avoid interacting in person for a while, and asked them to communicate with each other only by email. (Thompson Decl. ¶ 13.) They both agreed. (*Id.*) To confirm that Mr. Carter's sexual harassment claim had been dealt with to his satisfaction, Mr. Thompson sent an email to Mr. Carter on April 9. (*Id.* ¶ 14.) Mr. Carter responded by apologizing for some of his "offensive action," expressed his willingness to email with Ms. Edwards,

and indicated that "the whole matter . . . will be dropped." (Email from Ross A. Carter to Chuck Thompson, April 12, 1999.)

After the meetings with management, Mr. Carter's job performance deteriorated further. He took three days of leave in the two weeks following the meeting. (Shamberger Decl. ¶ 14.) His supervisor stated that Mr. Carter refused to communicate with anyone but him, and although he attempted to find work suitable for Mr. Carter given his limited level of training, Mr. Carter "basically stopped working." (Shamberger Decl. ¶ 14.) Mr. Carter contends that management held training efforts in abeyance and stopped assigning him work. (Compl.¶¶ 36–37.) He complains that after the meetings coworkers limited their contact with him, and that he was "ostracized." (Pl.'s Facts ¶¶ 14–15.) He did not, however, lodge any further complaints of sexual harassment with management. (Carlton Decl. ¶ 11.)

Because Mr. Carter's performance showed no improvement, Mr. Thompson went forward with his discharge. On April 20, 1999, Mr. Carter received a Notice of Proposed Termination, citing his excessive absences and inability to work well with others as the grounds for the proposal. (*See* Compl.¶ 105; Memorandum from Stephen J. Clark to Ross A. Carter.) He was placed on paid administrative leave, during which time the Board's Associate Director of Human Resources Functions, Darrell Pauley, investigated the proposed termination by interviewing Mr. Carter, his supervisors and his coworkers. (Pauley Decl. ¶¶ 4–6.) Mr. Carter also submitted a letter to Mr. Pauley, in an attempt to explain the "discriminatory behavior and retaliation" he was allegedly suffering.

---

3. Mr. Carter characterizes Ms. Edwards' position slightly differently, claiming that "Marcie Edwards stated she refused to work with

Plaintiff except by email." (Compl.¶ 92.) Any dispute about this is, however, immaterial.

(Opp. at 7; *see also* Letter from Ross A. Carter to Darrell R. Pauley, April 27, 1999.) Mr. Pauley ultimately recommended termination of Mr. Carter's employment, and Mr. Carter received notice that his employment was terminated as of May 15, 1999, due to his "inability and apparent unwillingness to work effectively as part of the payroll team." (Letter from Darrell R. Pauley to Ross A. Carter, May 7, 1999.) On May 19, 1999, Mr. Carter contacted the Board's Equal Employment Opportunity Office to complain about the sexual harassment he had allegedly experienced.[4] (Compl. ¶ 50.) Plaintiff thereafter filed this action *pro se.*

## STANDARD OF REVIEW

Defendant has moved to dismiss or, in the alternative, for summary judgment. Under Rule 12(b)(6), dismissal is appropriate only where a defendant has shown " 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *In re Swine Flu Immunization Prods. Liab. Litig.,* 880 F.2d 1439, 1442 (D.C.Cir.1989) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The allegations in Mr. Carter's complaint are presumed true for purposes of a 12(b)(6) motion, and all reasonable factual inferences should be construed in his favor. *Maljack Prods., Inc. v. Motion Picture Ass'n of Am., Inc.,* 52 F.3d 373, 375

(D.C.Cir.1995); *Phillips v. Bureau of Prisons,* 591 F.2d 966, 968 (D.C.Cir.1979). If factual matters outside the pleadings are submitted and considered by the court, however, the motion must be treated as a summary judgment motion under Fed. R.Civ.P. 56. In such cases, the standard changes from determining "whether a claim for relief has been stated" to determining whether there is a "genuine issue of material fact in dispute" and if "the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Under Rule 56, the Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine, and should preclude summary judgment, if a reasonable jury could return a verdict in favor of the non-moving party. *Id.* at 248, 106 S.Ct. 2505. In contrast, a moving party is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[5]

---

4. After receiving EEO counseling, Mr. Carter filed a formal complaint on June 20, alleging gender discrimination and retaliation resulting from his allegations of sexual harassment. The Board dismissed his complaint, and the Equal Opportunity Employment Commission upheld the Board's decision and denied Mr. Carter's request for reconsideration.

5. Contrary to Mr. Carter's insistence, at the summary judgment stage he must provide more than "a short and plain statement of the claim showing that [he] is entitled to relief."

(Opp. at 7–8, 16–18) (citing *Swierkiewicz v. Sorema,* 534 U.S. 506, 511, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).) Although some of his claims may satisfy the liberal notice pleading standard, to defeat summary judgment he must present evidence from which a jury could find that a *prima facie* case has been established. *See Taylor v. Small,* 350 F.3d 1286, 1292 (D.C.Cir.2003) (affirming summary judgment for defendant where plaintiff failed to establish prima facie case of discrimination or retaliation).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Washington Post Co. v. United States Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C.Cir.1989). However, the nonmoving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505 (internal citations omitted).

The court, therefore, "must assume the truth of all statements proffered by the party opposing summary judgment"—except for wholly conclusory statements for which no supporting evidence is offered. *Greene v. Dalton,* 164 F.3d 671, 674–75 (D.C.Cir.1999). "While summary judgment must be approached with special caution in discrimination cases, ... a plaintiff is not relieved of [his] obligation to support [his] allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Waterhouse v. Dist. of Columbia,* 124 F.Supp.2d 1, 4 (D.D.C. 2000), *aff'd,* 298 F.3d 989 (D.C.Cir.2002). In addition, Local Civil Rule 7(h) provides that "[a]n opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the part of the record relied on to support the statement."

As a *pro se* plaintiff, Mr. Carter was advised by the Court that factual assertions in defendant's sworn statements would be accepted as true unless he submitted his own affidavits, verified complaint, or documentary evidence contradicting them. (*See* Order December 17, 2003). *See also* L.Cv.R. 7(h) ("the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion"). Despite the requirements of the local rules and the Court's admonition that simple allegations would be insufficient to oppose a summary judgment motion, Mr. Carter has submitted almost nothing more. "Plaintiff's Statement of Material Facts as to Which it is Contended There Exists a Genuine Issue Necessary to be Litigated" ("Pl.'s Facts") fails to controvert most of the facts set forth by defendant, instead it merely repeats the complaint's allegations and conclusions.

Thus, the Court will assume that Mr. Carter admits those facts presented by defendant in its statement of material facts and accompanying declarations which he does not refute. While he has not yet had the opportunity to conduct significant discovery, Mr. Carter has neglected to submit a sworn statement or a verified complaint, even after court prompting.[6] But even assuming the unsubstantiated facts presented by Mr. Carter in his pleadings and

6. Plaintiff's lack of discovery does not operate to defeat summary judgment here, since he has failed to suggest any discoverable facts that would create a triable issue. *See Carpenter v. Fed. Nat'l Mortgage Ass'n,* 174 F.3d 231, 237 (D.C.Cir.1999) (affirming summary judgment for employer over plaintiff's request for discovery where plaintiff offered no reasonable basis to suggest that discovery would save his claim from summary judgment).

in his complaint are true, he has failed to present a genuine issue of material fact that would preclude the entry of summary judgment.

## ANALYSIS

### I. Sexual harassment claim

Mr. Carter claims that he "was placed in a hostile work environment because the conduct in question was unwelcome ... [and] sufficiently severe or pervasive to alter the condition of his employment." (Compl. ¶ 84.) Defendant contends that Mr. Carter's sexual harassment claim should be dismissed because: 1) he failed to bring it to an EEO counselor on a timely basis and thus did not exhaust administrative remedies; 2) as a matter of law the incidents he describes do not constitute actionable harassment; and 3) the Board took prompt and appropriate corrective action when it learned of the alleged harassment.

#### A. Exhaustion

■ A Title VII plaintiff must exhaust administrative remedy requirements set forth in the Act's implementing regulations in order to preserve the right to proceed with a claim against the employer in court. *See Brown v. Marsh,* 777 F.2d 8, 13 (D.C.Cir.1985); *Lloyd v. Chao,* 240 F.Supp.2d 1, 3 (D.D.C.2002). These regulations require an aggrieved party to initiate contact with an EEO counselor within 45 days of the alleged incident in an effort to resolve the situation informally. *See* 29 C.F.R. § 1614.105(a). Mr. Carter claims

that he was sexually harassed on three occasions, the last of which occurred on March 29, 1999. Thus, he had until May 13, 1999 to initiate the EEO process.[7] It is undisputed, however, that he did not contact an EEO counselor until May 19, 1999.[8] Mr. Carter contends, however, that he was led to erroneously believe that Ms. Carlton, a Board Employee Relations Specialist, was an EEO counselor, and that the meeting he attended with her, Mr. Thompson and Ms. Edwards on March 31, 1999 was an "informal EEO complaint meeting" that initiated the "informal EEOC complaint discrimination process." (Compl. ¶¶ 30, 41; Opp. at 11.)

■ Although the 45–day time limit may be equitably tolled, it is extended "only in extraordinary and carefully circumscribed instances." *Smith v. O'Neill,* 277 F.Supp.2d 12, 17 (D.D.C.2003) (citing *Mondy v. Sec'y of the Army,* 845 F.2d 1051, 1057 (D.C.Cir.1988)). For example, the 45–day period may be extended "when the individual shows that he or she was not notified of the time limits and was not otherwise aware of them ...." 29 C.F.R. § 1614.105(a)(2). If the information is available to the employee, however, he cannot claim unawareness as an excuse for missing the deadline. *O'Neal v. England,* No. 02–0172, 2003 WL 21788956, at *2 (D.D.C. July 17, 2003) (summary judgment granted for defendant when plaintiff claimed he was unaware of the 45–day deadline but record revealed that plaintiff had been given the information); *Pauling v. Sec'y of Dept. of Interior,* 960 F.Supp. 793, 804–05 (S.D.N.Y.1997) (same).

---

7. The events prior to March 29, 1999 could be considered part of one unlawful hostile work environment claim, but the claim would still have to be raised within 45 days of the last incident. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

8. Mr. Carter does not contest this date, which is confirmed by the Sexual Harassment Discrimination Complaint he filed with the Board's EEO Counselors on May 19, 1999 and the Declaration of Sheila Clark, the Board's EEO Program Director. (Clark Decl. ¶ 5.)

Courts may also toll the time limit when the defendant engaged in affirmative misconduct that caused plaintiff to miss the deadline. *Williams v. Munoz,* 106 F.Supp.2d 40, 43 (D.D.C.2000) (citing *Washington v. WMATA,* 160 F.3d 750, 752–53 (D.C.Cir.1998) (equitable tolling would be applied if defendant "tricked" plaintiff into allowing the filing deadline to pass)); *Jarrell v. USPS,* 753 F.2d 1088, 1092 (D.C.Cir.1985) (equitable tolling allowed where plaintiff failed to contact an EEO counselor in reliance on the advice of a government official).

■ Mr. Carter does not claim that he was unaware of the 45–day time limit for EEO notification (*see* Opp. at 12), and the record demonstrates that Mr. Carter was informed of the deadline.[9] While the evidence indicates that Mr. Carter indeed may have believed that Ms. Carlton was an EEO counselor (*see* Letter from Mr. Carter to Mr. Pauley, April 27, 1999), there is *no* evidence to support plaintiff's conclusory claim that "Mr. Thompson and Ms. Carlton *made* Plaintiff think Ms. Carlton was an EEO counselor." (Pl.'s Facts ¶ 9.)

In fact, Ms. Carlton's declaration directly refutes Mr. Carter's unsubstantiated allegation that he was misled by describing how she informed him of his right to contact an EEO counselor on March 30, 1999 and recounting his refusal to do so. (Carlton Decl. ¶¶ 8–9.) Furthermore, the Board's EEO Programs Director has stated that EEO complaint procedures were distributed to all employees in multiple formats, identifying EEO counselors and providing their contact information, and that Ms. Carlton was not on that list. (Clark Decl. ¶¶ 2–3.) The record is void of any evidence of affirmative misconduct on defendant's part, and therefore, Mr. Carter's misconception cannot serve to extend the deadline for EEO action. *See Brucks v. O'Neill,* 184 F.Supp.2d 1103, 1112 (D.Kan.2001) (employee's assumption that EEOC representative she contacted was an EEO counselor when in fact he was an EEO specialist, stemming from the specialist's advice that management took this type of claim very seriously, his authoritarian tone, and his suggestions regarding how to solve the problem, did not rise to the level of "active deception" required to warrant equitable tolling of the 45–day deadline).

Moreover, the fact that Mr. Carter engaged in an internal dispute resolution procedure with his supervisors and a human resources representative cannot replace the required initial contact with an EEO counselor within 45 days of the allegedly offensive incident. *See Johnson v. Henderson,* 314 F.3d 409, 415–16 (9th Cir. 2002) (although plaintiff complained regularly to supervisors and complied with internal sexual harassment complaint procedures, this conduct did not extend official EEO deadline); *Washington,* 160 F.3d at 752–53 (deadline was not extended even though plaintiff claimed that employer's touting of internal procedures as the appropriate complaint forum lulled him into presuming he had met the necessary requirements); *Steiner v. Henderson,* 194

---

**9.** Plaintiff and defendant submitted different versions of a brochure entitled "Sexual Harassment: Information on the Board Policy and the Resolution Process," published by the Board for distribution to employees. Both versions, however, indicate that "[e]mployees may seek relief from sexual harassment through the Board's EEO complaint procedures by contacting an EEO counselor *within 45 days* of the act" (emphasis in original). Mr. Carter cites the brochure repeatedly in his complaint and opposition, specifically addressing the version of the policy in effect while he was employed at the Board, and quotes various provisions on the very same page as the 45–day time-limit instruction appears. (*See* Compl. ¶¶ 121, 122; Opp. at 11, 15.)

F.Supp.2d 688, 690–91 (N.D.Ohio 2002), *aff'd*, 354 F.3d 432 (6th Cir.2003) (plaintiff's diligent pursuit of her grievances through supervisory channels did not excuse her from filing a timely claim with the EEO); *Dillard v. Runyon*, 928 F.Supp. 1316, 1327 (S.D.N.Y.1996), *aff'd*, 108 F.3d 1369 (2d Cir.1997) (supervisor's knowledge of complaint and failure to advise employee to contact EEO counselor did not constitute affirmative misconduct warranting the tolling of the 45–day period).[10] Plaintiff's sexual harassment claim is therefore appropriately dismissed for failure to exhaust administrative remedies.

### B. No actionable harassment

 Even assuming *arguendo* that Mr. Carter did exhaust the necessary administrative remedies, his sexual harassment claim would nonetheless fail for several reasons. Title VII is not a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). It does not serve as a remedy for all instances of verbal or physical harassment, but only those creating a hostile work environment. *Id.* A workplace is not "hostile" under Title VII unless the offensive conduct "permeates the workplace with discriminatory intimidation, ridicule or insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Williams v. Verizon Washington, D.C., Inc.*, 266 F.Supp.2d 107, 124 (D.D.C.2003) (quoting *Barbour v. Browner*, 181 F.3d 1342, 1347 (D.C.Cir. 1999)).[11]

 Therefore, to sustain a sexual harassment claim, the alleged incidents must be "more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Id.* (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 n. 1, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir.1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment."). It is not enough, furthermore, that the plaintiff *feel* intimidated or abused. To be actionable, the offensive conduct must create "an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive . . . ." *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (1993); *see also Oncale*, 523 U.S. at 81, 118 S.Ct. 998 ("the objective severity of the harassment should be judged from the

10. The Court acknowledges that there is authority in this Circuit to the contrary, *see Lloyd v. Chao*, 240 F.Supp.2d 1, 4 (D.D.C. 2002) (reporting incident to supervisors within 45 days is tantamount to initiating contact with an EEO counselor), but that case is not binding on this Court, and it is contrary to the weight of authority on this issue.

11. Specifically, a *prima facie* hostile work environment claim, required to defeat defendant's motion for summary judgment, must contain proof that plaintiff (1) is a member of a protected class (2) who was subjected to unwelcome sexual harassment (3) that was based upon sex (4) and had the effect of unreasonably interfering with his work performance and creating an intimidating, hostile, or offensive working environment, and finally, that (5) defendant has *respondeat superior* liability. *See Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1122–23 (D.C.Cir.2002). In determining whether harassment rises to this level, courts should consider the frequency of the harassing conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

perspective of a reasonable person in the plaintiff's position, considering all the circumstances") (internal quotation and citation omitted).

 Assuming that Mr. Carter's allegations that Ms. Edwards "caressed [him] on his knee," "placed her breast on [his] arm," and "placed her fingers on [his] buttocks" are true, as one must do at this stage, these three isolated incidents are not sufficiently severe in quantity or quality to unreasonably interfere with plaintiff's work performance or create a hostile work environment. Workplace sexual harassment claims based on such minor allegations are dismissed because "isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275. *See, e.g., Hilt–Dyson v. City of Chicago*, 282 F.3d 456, 463–64 (7th Cir.2002) (allegations that supervisor twice rubbed plaintiff's back and shoulders and stared at her inappropriately were insufficient to create hostile work environment); *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 585 (11th Cir.2000) (claim that coworker momentarily put his hand on plaintiff's knee, touched the hem of her dress, touched her ring and bracelet, and repeatedly asked her to lunch did not establish a hostile environment claim); *Valentine–Johnson v. Roche*, 238 F.Supp.2d 911, 917 (E.D.Mich.2003) (claim that supervisor put his arm around plaintiff without her consent and stood too close to her did not rise to the level of "severe and pervasive" harassment); *Murray v. City of Winston–Salem*, 203 F.Supp.2d 493, 498–99 (M.D.N.C.2002) (allegations that supervisor made a suggestive comment to plaintiff, put his arm around her, touched her thigh twice, and inappropriately stared at her were insufficient to establish a hostile work environment).

 Moreover, Mr. Carter has failed to present evidence that Ms. Edwards' conduct was objectively "physically threatening or humiliating," or that a reasonable person would view the conduct as severe, abusive, or even distracting. *See Gupta*, 212 F.3d at 586. Instead, the record suggests that Mr. Carter's discomfort with the incidents stems from his general discomfort with being in close proximity to other people.[12] Despite his extreme sensitivities, the alleged harassment represents, at most, "ordinary tribulations of the workplace." *Faragher*, 524 U.S. at 788, 118 S.Ct. 2275.

There is nothing, furthermore, to support or corroborate Mr. Carter's assertion that Ms. Edwards' alleged conduct was attributable to his gender or was in any way sexual in nature. *See Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998 (plaintiffs who pursue sexual harassment claims "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted dis-

---

12. Mr. Carter's statements suggest that Ms. Edwards' alleged conduct was bothersome only from his subjective perspective, corroborating his supervisors' characterization of his "unusual zone of privacy." In his March 12, 1999 email to Mr. Thompson, he states:

[T]he person who is the touchee does have the full right not to be touched at all if he or she elects not to be. And that person (the touchee), will know the difference between whether or not he or she is being touched in an offensive manner. Because, isn't it the touchee's body, anyway? And if it is the touchee's body, wouldn't he or she know what would or would not make he or she comfortable?

The fact that Mr. Shamberger was in the same room as Mr. Carter and Ms. Edwards when she allegedly touched his buttocks, yet did not notice the contact or perceive any disturbance, is further support for the conclusion that Ms. Edwards' conduct was neither severe nor abusive. (*See* Thompson Dec. ¶ 12.)

crimination because of sex"); *Hartsell v. Duplex Prods., Inc.*, 123 F.3d 766, 772 (4th Cir.1997) (sexual harassment plaintiff must present evidence to show that but for the fact of her sex, she would not have been the object of harassment). Mr. Carter's submissions illustrate the contrary. After the first alleged harassment incident, he claims that he accused Ms. Edwards of inappropriately touching him, and she responded by stating that she had no personal interest in plaintiff and asked him to leave her office. (Compl. ¶¶ 71–72; Opp. at 14.) Mr. Carter again accused her of improper conduct after the third incident, and she was so "extremely upset by these allegations" that she sought Ms. Carlton's advice. (Carlton Decl. ¶ 8.)[13] While the fair inference from the undisputed evidence is that the incidents of touching were merely inadvertent, the Court does not rest its decision on that basis. Instead, it concludes, crediting plaintiff's allegations and assuming intentional touchings, that Mr. Carter's complaints of subjective discomfort do not warrant Title VII relief because these incidents fall outside the law's prohibition against sexual harassment.

■ Finally, the defendant can only be held liable for Ms. Edwards' conduct if it "knew or should have known of the [alleged] harassment and failed to implement prompt and appropriate corrective action."

*Curry v. Dist. of Columbia*, 195 F.3d 654, 660 (D.C.Cir.1999). Corrective action is appropriate if it is reasonably designed to stop coworker harassment. *Coles v. Kelly Servs., Inc.*, 287 F.Supp.2d 25, 31–32 (D.D.C.2003) (citing *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430 (5th Cir.1992), *aff'd*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)).

Although Mr. Carter states that he "does not believe management fully investigated his claim of sexual harassment" (Pl.'s Facts ¶ 21), he does not deny that his supervisors responded quickly and reasonably to his complaint by immediately involving an Employee Relations Specialist, conducting a meeting with the parties, and arriving at a workable solution for everyone involved. Indeed, he responded to Mr. Thompson's email confirming the satisfactory resolution of the matter by indicating that the "whole matter ... will be dropped." Management could be expected to do nothing more for his protection. *See Coles*, 287 F.Supp.2d at 32.

For the above reasons, Mr. Carter has failed to establish a *prima facie* hostile work environment claim and thus, his sexual harassment claim will be dismissed.

## II. Disparate treatment based on gender

Among the complaint's sexual harassment allegations, Mr. Carter also seems to

---

**13.** In a memorandum Ms. Edwards sent to Ms. Carlton on March 30, 1999, submitted by Mr. Carter and cited in his opposition, Ms. Edwards recounts her side of the story regarding both incidents. She explained that the first incident of touching occurred during computer training because Mr. Carter "was beginning to make a drastic error by quick picking the wrong field [and her] reaction was 'Ross no, don't do that,' and unintentionally [her] hand tapped his knee because [she] reacted by using a hand gesture. Ross then said 'don't put your hands on me I'm a married man ....'" She stated that she apolo-

gized but "was very disturbed and offended by his comment." She was not even aware that the third incident of touching had occurred until Mr. Carter brought it to her attention by asking her, "[W]hy did you put your body parts on me?" She responded by stating, "[E]xcuse me, I did no such thing!" and accused Mr. Carter of being "very imaginative" and "derogatory." She denied having any personal interest in Mr. Carter, or ever "jokingly or playfully ma[king] any flirtatious remarks or gestures" toward him. (*See also* Opp. at 14–15.)

be alleging that he was subject to disparate treatment at the workplace based on his gender. Mr. Carter appears to be complaining that he was treated differently than a female coworker in two respects. He alleges that while he was required to complete a series of calculations before being trained on a specific process, his supervisor did not require his female colleague to do the equivalent calculations before training. (Compl.¶¶ 75–80.) Secondly, he suggests that he was "reprimanded for excessive absenteeism," while a female coworker "[n]otably ... was absent from work much longer" than he was, which "did not seem to concern management, nor did it appear to create problems." (*Id.* ¶ 16; Opp. at 4; Pl.'s Facts ¶ 5.)

■ Under Title VII, in order to state a *prima facie* case of gender discrimination Mr. Carter must establish that: (1) he is a member of a protected class; (2) he suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination. *Brown v. Brody,* 199 F.3d 446, 452 (D.C.Cir.1999). He cannot prevail, therefore, unless his employer took some adverse action because of his membership in a statutorily protected group. *See Forkkio v. Powell,* 306 F.3d 1127, 1130–31 (D.C.Cir.2002).

■ Actions short of an outright firing can be adverse, but not all personnel decisions with negative consequences for the employee necessarily qualify as adverse actions. To be legally sufficient, the action must have had "materially adverse consequences affecting the terms, conditions, or privileges of [plaintiff's] employment or [plaintiff's] future employment opportuni-

ties ...." *Brown,* 199 F.3d at 457; *see also Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Thus, changes such as demotion, undesirable reassignment, or the loss of a bonus may be sufficiently significant, *see Faragher,* 524 U.S. at 808, 118 S.Ct. 2275; *Russell v. Principi,* 257 F.3d 815, 819 (D.C.Cir. 2001), but actions imposing purely subjective harms, such as dissatisfaction or humiliation, are not adverse. *See Forkkio,* 306 F.3d at 1130–31; *Childers v. Slater,* 44 F.Supp.2d 8, 19 (D.D.C.1999) ("conduct that sporadically wounds or offends but does not hinder an employee's performance does not rise to the level of adverse action"), *modified on reconsideration,* 197 F.R.D. 185 (D.D.C.2000); *Jones v. Billington,* 12 F.Supp.2d 1, 13 (D.D.C.1997), *aff'd,* No. 98–5014, 1998 WL 389101 (D.C.Cir. June 30, 1998) ("not everything that makes an employee unhappy is an actionable adverse action").

■ Applying these governing legal principles, the Court must conclude that plaintiff's claim of gender-based disparate treatment falls woefully short of constituting "adverse employment actions." He may well have been offended by the imposition of different training requirements and hurt by his supervisor's reprimands, but he did not experience a change in job responsibilities of the magnitude necessary to give rise to a cause of action. *See Bryant v. Brownlee,* 265 F.Supp.2d 52, 62 (D.D.C.2003).[14]

---

14. Furthermore, there are serious doubts as to whether he and the female coworker who allegedly received favorable treatment could be considered "similarly situated per-
son[s][who] were treated disparately." *Holbrook v. Reno,* 196 F.3d 255, 261 (D.C.Cir. 1999). The record indicates that she was employed by the Board for at least four years.

## III. Retaliation claim

■ Mr. Carter claims that after he voiced his allegations of sexual harassment, he was retaliated against, which created a hostile work environment and led to his termination. In order to establish a retaliation claim, he must demonstrate that: (1) he engaged in a statutorily protected activity; (2) the employer took an adverse personnel action; and (3) a causal connection existed between the two. *See Brown*, 199 F.3d at 452. Causation is often demonstrated by proximity in time, *see Gleklen v. Democratic Congressional Campaign Comm., Inc.*, 199 F.3d 1365, 1368 (D.C.Cir.2000), but can be negated by evidence discrediting any claim of retaliation. *See Roberts v. Segal Co.*, 125 F.Supp.2d 545, 550 (D.D.C.2000).

If Mr. Carter establishes a *prima facie* case, the Board must articulate a legitimate, nondiscriminatory reason for its actions. *See Bryant*, 265 F.Supp.2d at 67 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The Board's burden is only one of production, however, and it "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the Board is successful, the burden shifts back to Mr. Carter to show that the Board's stated reason was a mere pretext for retaliation. *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)). Pretext may be established "by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. The Court may also "consider the evidence establishing the plaintiff's *prima facie* case and

inferences properly drawn therefrom on the issue of whether the defendant's explanation is pretextual." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (citation and internal quotations omitted). However, "[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C.Cir.1996).

### A. Retaliatory hostile work environment

Mr. Carter has alleged that both management and his coworkers retaliated against him after he brought the accusations against Ms. Edwards to the attention of his supervisors. He claims that "management held training in abeyance," and "stopped assigning [him] work." (Compl.¶¶ 36–37.) He also complains that his supervisors permitted his coworkers "to use e-mail to contact him, . . . to bar him from entering their offices and . . . not to allow [him] to use the equipment in their offices." (Opp. at 13.) Against his coworkers, he alleges that several of them sent him (and their supervisors) a memorandum "stating they did not want to work with [him] because he had participated in the informal EEOC complaint process against co-worker Marcie Edwards." (Compl.¶ 115.) He also provides a specific example of a coworker's refusal to interact with him, alleging that a Ms. Jefferson told him "he could no longer come into her office to use her printer." (*Id.* ¶ 98.)

■ As in general disparate treatment cases, an "adverse personnel action" can result from retaliatory actions of management that have materially adverse consequences affecting the terms, conditions,

---

One might expect that as a new employee, Mr. Carter would be subject to different train-

ing procedures, and that his repeated absences would cause more alarm.

or privileges of the employee's position. *See Walker v. WMATA,* 102 F.Supp.2d 24, 29 (D.D.C.2000) (an "employment decision does not rise to the level of an actionable adverse action ... unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage"). As in claims alleging hostile work environments created by sexual harassment, retaliatory harassment claims must demonstrate severe or pervasive retaliation relative to the circumstances of the workplace. *See Bryant,* 265 F.Supp.2d at 67.

■ Assuming that training sessions and new assignments were in fact deferred, Mr. Carter's employment was affected for a period of only eleven working days, and he fails to address how these changes actually disadvantaged him such that they could be considered adverse personnel actions. *See Haddon v. Executive Residence at the White House,* 313 F.3d 1352, 1364 (Fed.Cir.2002) ("Most of the actions that courts have recognized as adverse employment actions are more tangible and permanent than [a] short suspension without loss of pay ...."). Even if they amount to severely detrimental employment changes, which they are not, it is obvious from the record that the Board's actions were not caused by Mr. Carter's complaints about Ms. Edwards, but by his own performance deficiencies. It is difficult to train an employee who comes "in to work in the morning and close[s] his door, refusing to communicate with anyone" other than his direct supervisor, and nearly impossible to assign tasks to someone who refuses to work with the other staff and has "basically stopped working." (Shamberger Decl. ¶ 14.) It is reasonable, moreover, to assume that an employer would choose not to expend training resources or assign new projects to an employee on the verge of termination. (*See id.* ¶ 9, 11.)

Furthermore, Mr. Carter claims that he was subject to disparate treatment *before* he alleged sexual harassment, as discussed in Part II above, which undermines any causal inference. *See Roberts,* 125 F.Supp.2d at 550 (plaintiff's admission that offensive behavior preceded her protective activity rendered causal connection illogical). The undisputed evidence therefore precludes the conclusion that management made changes in Mr. Carter's employment because of his EEO activity.

Mr. Carter's claim that his coworkers retaliated against him also suffers from a failure to establish causation. Descriptions of his "unusual zone of privacy" and his difficulties getting along with his coworkers indicate that he was complicit in undermining their working relationships. *See Bryant,* 265 F.Supp.2d at 69. The evidence also demonstrates that Mr. Carter's difficulties working with his colleagues preceded his EEO complaint by many months. (*See, e.g.,* Shamberger Decl. ¶ 4 ("Shortly after Mr. Carter began his employment at the Board, I became aware of performance problems related to his inability to work well with others.").) This evidence further undercuts any proof or presumption of causation. *See Bryant,* 265 F.Supp.2d at 70.

■ In any event, "shunning or ostracism by co-workers and supervisors is insufficient to sustain a retaliation claim." *Id.; see also Williams v. City of Kansas City,* 223 F.3d 749, 754 (8th Cir.2000) ("[Defendant's] silent treatment [of plaintiff] is at most ostracism, which does not rise to the level of an actionable adverse employment action."); *Ray v. Henderson,* 217 F.3d 1234, 1241 (9th Cir.2000) (" 'mere ostracism' by co-workers does not constitute an adverse employment action"). The fact that Mr. Carter believes he was getting the cold shoulder from his coworkers simply does not constitute a materially

adverse consequence or disadvantage in the terms and conditions of his employment so as to establish an adverse personnel action. *See Roberts,* 125 F.Supp.2d at 549; *Raymond v. U.S. Capitol Police Bd.,* 157 F.Supp.2d 50, 59 (D.D.C.2001).

## B. Retaliatory termination

■ Although termination from an employment position clearly constitutes an adverse personnel action for Title VII purposes, *see, e.g., Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), Mr. Carter's retaliation claim suffers from a lack of evidence of causation. The sworn declarations submitted by defendant consistently aver that by March 24, 1999, management had decided to fire Mr. Carter. (Thompson Decl. ¶ 7; Shamberger Decl. ¶ 9; Carlton Decl. ¶ 4.) Mr. Thompson stated that he contacted Ms. Carlton on that date because he "wanted to terminate [Mr. Carter] immediately." (Thompson Decl. ¶ 7.) On March 26, Mr. Shamberger told Mr. Carter that he was going to meet with him on March 29, and in that meeting, he and Mr. Thompson discussed Mr. Carter's deficiencies, basically telling him to "shape up or ship out." (Shamberger Decl. ¶¶ 9, 11.) It was then that Mr. Carter asserted to management *for the first time* that he had been sexually harassed by Ms. Edwards. (*Id.* ¶ 12.) In fact, in the complaint Mr. Carter identifies March 30, the day he first met with Mr. Carlton, as the initiation of "the informal EEOC complaint discrimination process." (Compl.¶ 101.) Because his supervisors' dissatisfaction with his performance and their intentions to terminate

him predated his protected activity, his retaliatory discharge claim is illogical and must be dismissed.[15] *See Trawick v. Hantman,* 151 F.Supp.2d 54, 63 (D.D.C. 2001), *aff'd,* No. 01–5309, 2002 WL 449777 (D.C.Cir. Feb 21, 2002) (because the termination process had already been initiated, no reasonable juror could conclude that the termination had been caused by the EEO activity).

■ Even if Mr. Carter could establish a *prima facie* case, defendant has produced non-retaliatory, legitimate reasons for plaintiff's termination, and plaintiff has been unable to adduce any evidence of pretext. The letters proposing and effecting his discharge echo the consistent concerns voiced by his supervisors: despite the fact that "the ability to work in close proximity to others and part of a team [was] crucial to [his] job," and the Board's attempts to "work around [his] sensitivity to physical contact," he consistently "demonstrated an unwillingness and an inability to work well with others," and through his conduct "indicated that [he was] not willing to deal face-to-face with other staff on a continuing basis." (Letter from Mr. Clark to Mr. Carter, April 20, 1999.) As a second grounds for termination, Mr. Carter's "unanticipated and excessive absences [were] disruptive" (*id.*), and would not be any less so even if they were approved by management as Mr. Carter contends.

In evaluating the Board's justification for its actions, "the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Trawick,*

---

15. There is an indication in the record that although Mr. Carter did not report his allegations to management until the meeting on March 29, Ms. Edwards brought the accusations to Mr. Thompson's attention that morning before the meeting. (*See* Memorandum from Ms. Edwards to Ms. Carlton, March 30, 1999.) That Mr. Carter's supervisors were aware of the allegations shortly before the meeting is not proof that his termination was retaliatory, however, because the record clearly shows that they had already planned, even before the meeting date, to terminate his employment.

151 F.Supp.2d at 63 (citing *Fischbach*, 86 F.3d at 1183). The record before the Court is devoid of any reason to doubt the Board's rationale. Mr. Carter does not refute the Board's assertions that teamwork was critical in his position, and he makes little attempt to dispute the sworn statements of his supervisors describing his numerous problems with coworkers.[16] Moreover, Mr. Thompson and Mr. Shamberger explained to Mr. Carter that his performance inadequacies were the reason for their March 29, 1999 meeting (*see* Compl. ¶ 88), and both the official who proposed Mr. Carter's discharge and the manager who officially terminated his employment have declared that Mr. Carter's sexual harassment complaint had no bearing on their decision. (Clark Decl. ¶ 5; Pauley Decl. ¶ 7.)

"Filing a Title VII action ... is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or insubordination." *Gregg v. Hay–Adams Hotel*, 942 F.Supp. 1, 9–10 (D.D.C. 1996). Mr. Carter has not demonstrated that he was terminated for any reason other than his performance deficiencies, and thus, his retaliation claim must be dismissed.

## IV. Improper evidence submission claim

■ Mr. Carter's final claim in Count III relates to the administrative phase of his case. He complains that the Board introduced an updated version of its Sexual Harassment brochure during the administrative proceeding—a version that became effective after plaintiff's termination. (Compl.¶ 121–122.) In support of this claim he cites 29 C.F.R. § 1614.109, which

provides for an "adverse inference and other sanctions" when a party commits "misconduct in the development of the record." (Opp. at 1.) This regulation provides sanctions that an administrative law judge may impose if the agency "fail[s] without good cause shown to respond fully and in timely fashion to an order of an administrative judge." 29 C.F.R. § 1614.109(f)(3).

■ Mr. Carter offers no authority, however, to suggest that this regulation gives rise to a private right of action in federal court, and even more significantly, fails to identify any injury with respect to its alleged violation. Instead, it is clear that Title VII creates no independent cause of action for the mishandling of an employee's discrimination complaints, *see Nelson v. Greenspan*, 163 F.Supp.2d 12, 18 (D.D.C.2001), and in any event, Mr. Carter's failure to identify any injury he may have suffered from the alleged substitution of an updated brochure requires the Court to dismiss the claim.

## CONCLUSION

Plaintiff has failed to present a genuine issue of material fact that would preclude the entry of summary judgment for defendant on Counts I and II of his complaint, and has failed to state a claim for relief with respect to Count III. Defendant's motion, therefore, will be granted, and the complaint will be dismissed with prejudice. A separate Order accompanies this Memorandum Opinion.

## *ORDER*

For the reasons presented in the accompanying Memorandum Opinion, it is this 19th of February, 2004, hereby

---

16. Mr. Carter only states that he had "no training problems" with coworkers during a month-long absence taken by Ms. Edwards, (Opp. at 4), an allegation that is not inconsistent with the supervisor's sworn statements and the Board's justification.

ORDERED that defendant's Motion to Dismiss or, in the Alternative, for Summary Judgment is **GRANTED**; and it is

**FURTHER ORDERED** that plaintiff's complaint is **DISMISSED WITH PREJUDICE.**

**THIS IS A FINAL APPEALABLE ORDER.**